Alvy T. McQUEEN, Plaintiff,

v.

**UNITED STATES of America,**
**et al, Defendants.**

Nos. H–91–0329, 95–1453.

United States District Court,
S.D. Texas,
Houston Division.

March 30, 1998.

John A. Townsend, Townsend & Jones, Houston, TX, for Plaintiff.

Stuart D. Gibson, U.S. Department of Justice, Tax Division, Washington DC, Robert L. Bernard, Assistant U.S. Attorney, Houston, TX, for Defendants.

### REVISED MEMORANDUM OPINION

COBB, District Judge, Sitting by Designation.

### I.

### Prologue

On July 8, 1992, Alvy T. McQueen (McQueen) was indicted by a federal grand jury in the Southern District of Texas, charging twenty-four (24) counts of diesel fuel tax evasion. He plead guilty to Counts 1 and 23 of the indictment which charged him with willfully attempting to evade federal diesel fuel excise taxes. McQueen also waived indictment and voluntarily entered a guilty plea to an information charging one count of conspiracy to impede the collection of diesel fuel excise taxes. On March 16, 1993, Judge Melinda Harmon sentenced him to sixty-months (60) incarceration.

In subsequent civil proceedings, McQueen and his lawyer John Townsend (Townsend), have engaged in an oppressive litigation war against almost everyone connected with McQueen's criminal prosecution. In a prior action, McQueen unsuccessfully sought to recover damages from Texas State Comptroller Bob Bullock. *See McQueen v. Bullock,* 907 F.2d 1544 (5th Cir.1990), *cert. denied,* 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991) (McQueen II). He now attempts to reassert many of the same claims which were previously rejected in *McQueen v. Bullock* against, Assistant United States Attorney (AUSA) Pecht (Pecht), who was in charge of the criminal prosecution against McQueen and IRS agents Susie Wong (Wong) and Mark Hughes (Hughes).

In this consolidated suit, McQueen alleges that:

1. Defendants, Pecht, Wong, and Hughes were in contempt of court, and therefore, personally liable for disclosing grand jury information, in violation of Federal Rule of Criminal Procedure 6(e) (Rule 6(e) Claim);

2. Such disclosure violated 26 U.S.C. § 6103(d), and consequently, the United States is liable for damages under 26 U.S.C. § 7431 (Section 6103(d) Claim);

3. Hughes disclosed information to Pecht in violation of 26 U.S.C. § 6103(h), and consequently, the United States is liable for damages under 26 U.S.C. § 7431 (Section 6103(h) Claim);

4. The Department of Justice refused to release documents in violation of the Freedom of Information Act, 5 U.S.C. § 552 (FOIA Claim);

5. Pecht, Wong, and Hughes conspired to subvert McQueen's substantive and procedural due process rights in a manner actionable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (*Bivens* Claim).

Presently before the court is the United States', Pecht's, Wong's and Hughes' (defen-

dants) motion seeking partial summary judgment against McQueen pursuant to Fed. R.Civ.P. 56. The four issues addressed in this opinion are: 1) should the FOIA claim against the Department of Justice be severed from this case?; 2) should the Rule 6(e) claim be dismissed?; 3) should the Section 6103(d) claim be dismissed?; and 4) should the Section 6103(h) claim be dismissed? [1]

In response, McQueen filed his Motion for Judgment as a Matter of Law, seeking to prevail on the Rule 6(e), Section 6103(d), and Section 6103(h) claims.

The court has considered the parties' arguments in light of the applicable law and for . the reasons stated below, the court will: 1) sever H–95–1453 from H–91–0329; 2) dismiss with prejudice H–95–1453 in its entirety; 3) dismiss with prejudice the Rule 6(e), Section 6103(d), and Section 6103(h) claims from H–91–0329; and 4) enter a case management order addressing the plaintiff's sole remaining claim from H–91–0329—the FOIA claim.

## II.

## BACKGROUND

### A. The IRS Search Warrant, Federal Grand Jury Subpoena, and the Seizure of McQueen's Documents

#### 1. McQueen's Version

McQueen states that around the time of the Project, a federal grand jury was conducting an industry-wide investigation of motor fuels tax evasion in the Houston area. He charges that because he was an individual involved in the motor fuels business, he was already a target of the grand jury investigation. He claims that the grand jury investigation was jointly conducted by AUSA Pecht and IRS agents Hughes and Wong. He further insinuates that both the Federal Bureau of Investigation (FBI) and the Texas State Comptroller's Office (STCO) were also in-

volved in both the IRS administrative and the grand jury investigations, and therefore they were also investigating McQueen.[2] McQueen argues that it follows that the IRS search warrant, which was executed in Colorado was issued in furtherance of the grand jury investigation. Specifically, McQueen asserts that Pecht, in the course of conducting the "industry-wide" grand jury investigation, in effect issued the Colorado search warrant because she saw Hughes' Application and Affidavit for Search Warrant wherein Hughes provided sufficient facts to show probable cause that McQueen committed tax fraud. He further argues that Pecht's subsequent opening of a federal grand jury investigation targeting McQueen was essentially a sham because all investigations were in effect merged into one, with McQueen the target.

In support of his position, McQueen offers a passage from a brief (Brief) filed by the United States in *McQueen II*. The passage states that prior to June 1988, the U.S. was "conducting an *industry-wide* investigation into the evasion of federal motor fuels excise taxes within the state of Texas. Those investigations encompass both Internal Revenue Service administrative criminal investigations and grand jury investigations. *IRS special agents Hughes and Wong are involved in both the administrative criminal investigations and the grand jury investigations.*" Brief at 3 (internal citations omitted) (*emphasis added*).

#### 2. Defendants' Version

On or about January 7, 1987, the IRS Criminal Investigation Division (CID) in Houston opened an Information Gathering Project (Project) to investigate the possible evasion of federal motor fuel taxes. Wong was initially assigned to coordinate the Project and Hughes was subsequently assigned to work with her.

---

**1.** The *Bivens* action is not before the court at this time the court having already entered an order dismissing it.

**2.** In sworn affidavits, the defendants and the FBI attest to the fact that neither the FBI, nor the STCO played any role in the administrative in-

vestigation, or the later grand jury investigation of McQueen. In contrast, McQueen provides no evidence (other than mere allegations) that either the FBI or the STCO played any role in the IRS administrative investigation, or the later grand jury investigation of him.

The defendants maintain that evidence developed in the Project led to the opening of a federal grand jury investigation (Grand Jury I) which targeted an *individual who is not a party to this suit.* They acknowledge that AUSA Pecht was in charge of Grand Jury I and that both Hughes and Wong gathered evidence about the target pursuant to their duties on the Project.

Hughes states that sometime around June 7, 1988, he learned from an employee of the STCO that McQueen was being investigated by the STCO for tax fraud and that pursuant to that investigation, the STCO subpoenaed certain documents from McQueen. Later, Hughes learned from a confidential informant (CI) that McQueen was sending documents which had been subpoenaed by the STCO to Colorado for concealment and possible destruction. Hughes states that the IRS, based on the CI's information and evidence gathered in the Project, opened an administrative investigation of McQueen on June 17, 1988. Hughes, who was designated as the lead agent in the IRS administrative investigation, further maintains that although the IRS investigation was coincidental Grand Jury I, the two investigations were entirely unconnected. Finally, the defendants collectively maintain that when the IRS opened its administrative investigation of McQueen on June 17, 1988, McQueen was *not the target of any federal grand jury investigation.*

Pursuant to the IRS investigation, Hughes sought a search warrant to obtain the documents which McQueen had moved to Colorado. In seeking the search warrant, he was required to have an AUSA review and sign off on the request before presenting it to a magistrate.[3] To meet that requirement, Hughes presented the search warrant application and an affidavit with enough evidence to raise probable cause for Pecht to sign off on before presenting it to the magistrate. Thereupon, Pecht advised Hughes that he needed the approval of a U.S. Magistrate Judge in the District of Colorado.

Hughes and Wong flew to Colorado on June 18, 1988. On that day, Magistrate Judge Clifton of the District of Colorado authorized Hughes and Wong to execute the search warrant. Later that day, Hughes, Wong, and other law enforcement officers seized documents and property pursuant to the search warrant. Hughes and Wong shipped these seized documents to an IRS-leased space in the federal courthouse in Houston. Defendants maintain that none of the evidence contained in Application and Affidavit for Search Warrant had been presented to or learned from any federal grand jury.

In a curious sequence of events which ultimately led two grand jury investigations targeting McQueen, sometime between June 20 and July 14, McQueen's lawyer, Townsend spoke to AUSA Pecht and volunteered to produce McQueen's business records which had not been seized pursuant to the IRS search warrant. On July 14, 1988, Hughes learned from his CI, that McQueen had begun shredding the documents which Townsend promised to produce. The next day Hughes relayed this information to Pecht who promptly opened a grand jury investigation of McQueen on a charge of *obstruction of justice* (Grand Jury II). Pecht assigned Hughes to assist with Grand Jury II and had Hughes serve a grand jury subpoena on Townsend. Also July 15, 1988, Pecht asked the IRS for and subsequently received authorization[4] to expand Grand Jury I (hereinafter Grand Jury III) to target McQueen. The defendants steadfastly maintain, McQueen was not a target of Grand Jury I or any other federal grand jury investigation prior to July 15, 1988 and they also maintain that none of the documents seized pursuant to the Grand Jury II subpoena were disclosed to any STCO employee.

Between June 20 and September 20, 1988, the STCO, which was conducting its own investigation of state motor fuels tax evasion, contacted Wong and Hughes seeking permis-

---

3. Pecht, in her sworn affidavit, states at that time U.S. Magistrates in the Southern District of Texas would not consider an Application and Affidavit for Search Warrant if it has not been reviewed and initialed by a federal prosecutor.

Pursuant to that policy, Hughes contacted Pecht, who was then responsible for prosecuting most of the tax matters, to obtain the required review.

4. By letter dated August 8, 1988.

sion to view the documents seized pursuant to the IRS investigation search warrant. Wong and Hughes consulted Pecht to see if such a disclosure was permitted. Pecht advised that such a disclosure was permitted, primarily because the documents sought by the STCO had not shown to a grand jury and were not obtained pursuant to a grand jury subpoena. Hence, beginning September 20, 1988, and continuing for a few weeks thereafter, Wong and Hughes allowed STCO civil auditors to view and photocopy the documents seized pursuant to the Colorado search warrant.

## B. Tax Coordination Agreement and Tax Implementation Agreement

In 1986, the IRS and the STCO entered into an Agreement on Coordination of Tax Administration (TCA). Section 3.2 of the TCA states, "This agreement constitutes the requisite authorization pursuant to section 6103(d)(1) of the Code for IRS to disclose to, and permit inspection by, an [STCO] Representative of Federal returns and Federal return information relating to taxes imposed by ... Chapter 32—Manufacturer's Excise Tax ... of the Code." [5]

To implement the TCA, the IRS, and the STCO entered into a corresponding Implementation of the Agreement on Coordination of Tax Administration (TIA). Section I.B of the TIA provides that one purpose of the TIA is "[to] state procedures and understandings concerning the exchange of [federal tax] information." It follows that the TIA was intended as an ancillary statement of procedures rather than as a general request for tax information pursuant to § 6103(d)(1) of the Code.

The TIA sets certain procedures for disclosure of federal tax information to STCO. Under the TIA, when the IRS has informa-

tion of state tax understatement, an IRS liaison officer must determine that either $1,000 is understated or that the understatement involves a criminal tax violation. Next, the IRS liaison official must contact the STOC liaison officer and describe the return information in question and disclose the identity of the taxpayer. (Section IV.B). If the STOC wants the federal tax return information, it must submit a statement of need, "accompanied [by] or incorporated into a written request for the information signed by ... designated [STOC] disclosure officer." The TIA further states that, "access [to Federal return information] will be denied without presentation of such signed authorization." *Id.*

## C. Analysis

McQueen's version of the facts is neither substantiated nor credible. In a nutshell, McQueen's position rests precariously on his assertions that:

1. Pecht's role in Wong's and Hughes' IRS administrative investigation of McQueen and Wong's and Hughes' roles in Pecht's grand jury investigation of another party were so intertwined that the two investigations were in essence merged into one and consequentially McQueen a target of the grand jury long before he was formally named as a target of the grand jury on July 15, 1988;

2. All documents pertaining to any investigation of McQueen are presumptively before the grand jury; and

3. Any meeting after February 17, 1988 that occurred at any time between Wong, Hughes, and Pecht or any of these named defendants and anyone in the FBI or STCO involved the sharing of information concerning McQueen's personal income tax

5. In a sworn affidavit, Mimi Eastman authenticated the Texas Coordination Agreement Section 3.2 of the of which permits the disclosure of

Federal Tax Returns and information pursuant to the motor fuel excise tax (imposed by Chapter 32 of the IRS Code) which is at issue in this case.

matters are presumptively 26 U.S.C. § 6103 violations.[6]

As evidence that Hughes' and Wong's IRS administrative investigation and Pecht's grand jury investigation merged, McQueen offers the fact that shortly after the documents were seized pursuant to the Colorado search warrant, his attorney Townsend contacted AUSA Pecht and offered to produce McQueen's remaining business records.[7] The imputation being that Townsend made the offer to the one person in charge of the "merged investigation" and that if McQueen was not the target of the grand jury, Pecht would have said so and declined the offer.[8] Because there are so many other explanations for Townsend's offer that are equally or more plausible, McQueen's reliance on this as evidence of a merged investigation is mis-

6. McQueen asserts that the following meetings concern "potential disclosures" of McQueen's tax returns in violation of 26 U.S.C. § 6103:

| Date | Parties | Alleged Subject |
| --- | --- | --- |
| February 17, 1988 | Wong and Task Force [Project] incl. Pecht | To Discuss McQueen |
| March 11, 1988 | Wong and FBI | To Discuss surveillance |
| March 22, 1988 | Wong and FBI | To Discuss surveillance |
| March 24, 1988 | Wong and FBI | To Discuss surveillance |
| April 11, 1988 | Wong and FBI | To Discuss McQueen |
| May 9, 1988 | Wong and FBI | To Discuss McQueen |
| May 26, 1988 | Wong and FBI | To Discuss McQueen |
| June 10, 1988 | Task Force [Project] | To "discuss matters that were then present in McQueen's specific case." |
| June 15, 1988 | Wong and Pecht | Discuss the search warrant |
| June 27, 1988 | Wong and Pecht | Discuss matters related to the search warrant seizure and other matters that defendants assert was solely an IRS administrative investigation |
| July 12, 1988 | Wong and Pecht | Discuss the search warrant |
| July 13, 1988 | Wong and Pecht | To discuss a conversation with Townsend |
| June 18–July 15, 1988 "various meetings" | Wong and Pecht | To discuss various conversations with Townsend |
| September, 1988 "various meetings" | Pecht, Wong, & Hughes | Regarding controller's request for access to search warrant documents |

7. In his deposition, Townsend testified that sometime between mid-June and mid-July 1988, he believed that Pecht possessed a copy of the Application and Affidavit for the search warrant.

8. Premised in this implication is the notion that McQueen's attorney is infallible in his reading of the events and circumstances surrounding the seizure of the documents pursuant to the Colorado search warrant. The court notes that a common thread which runs through the massive volume of motions, memoranda, and correspondences with which Townsend has inundated this court, is Townsend's continual trumpeting that his credentials as a former IRS attorney and adjunct tax law professor at a local law school somehow affords him "special knowledge or insight" of how any law or regulation related to tax should be interpreted. This Court finds the premise of Townsend's infallibility and the notion that he has "special knowledge or insight" to be somewhat overstated.

placed.[9] This court finds Townsend's offer to produce the business records constitutes no real evidence of a merged investigation.

McQueen's reliance on the passage from the Brief is similarly misplaced. *See supra.* Even when viewed in a light most favorable to McQueen, the passage is neither an admission, nor is it evidence that McQueen was a target of any state or federal grand jury investigation before July 15, 1988. At most, the passage is a literal statement of undisputed fact concerning existence of both an IRS administrative investigation and a federal grand jury investigation. Furthermore, the Brief provides not a shred of direct evidence that McQueen was targeted by Grand Jury I.

In contrast, Hughes attested to the fact that he did not use any evidence from any grand jury in the IRS investigation or the application for the Colorado Search Warrant. Likewise, Pecht swore that she had nothing to do with Hughes' and Wong's IRS investigation of McQueen, and that she only examined the documents accompanying Hughes' application for a search warrant in her routine capacity as a federal prosecutor.[10] The defendants also offer the IRS letter August, 8, 1988 permitting Pecht to expand the grand jury to target McQueen as further evidence that he had not previously been a target of Grand Jury I.

In this court's opinion, McQueen's assertion that Grand Jury I and the IRS administrative investigation were merged is merely a statement of his subjective belief and is unsupported by the evidence. Furthermore, McQueen's failure to produce tangible evidence that Grand Jury I was merged with the IRS investigation was not for his lack of trying. During discovery, McQueen conducted numerous lengthy depositions, and gathered many documents, none of which he is able to point to as evidence in support of his position. Any further discovery on this point would be futile. Therefore, this court finds the IRS administrative investigation and Pecht's grand jury investigation were distinct and parallel investigations and were **not** merged.[11]

McQueen's second assertion that all documents pertaining to any investigation of McQueen are presumptively "matters before the grand jury" is grounded on his first assertion and therefore, must be considered in light of this court's finding that the IRS administrative investigation and Grand Jury I were not merged. Because there was no merger of the investigations, this court holds there can be no presumption that all documents, particularly those seized pursuant to the Colorado search warrant, are "matters before the grand jury". Absent a presumption to rely upon, McQueen must show by a preponderance of the evidence that a document was shown to the grand jury or acquired pursuant to a grand jury subpoena or grand jury proceeding in order to be a "matter before the grand jury".

The court looks at McQueen's assertion that various meetings between the named defendants and the FBI presumptively constitute violations 26 U.S.C. § 6103. *See Fn. 6, supra.* No reasonable person can draw such a inference from these meetings, and McQueen offers no tangible evidence that disclosures of tax returns or tax information

---

**9.** Another equally plausible explanation is that Townsend, knowing of the parallel investigations, realized that McQueen was may have been exposed to significant tax liability if his business records were to be made available to the IRS and STCO administrative investigations. Armed with such knowledge, it is possible that Townsend devised a strategy to limit McQueen's exposure for the unpaid excise taxes by offering the business records to Pecht and Grand Jury I, thereby making them "matters before the grand jury" and potentially shielding them from both the IRS' and STCO's investigations. Knowing someone other than McQueen was the target of Grand Jury I, such a strategy, if successful, may have limited McQueen's exposure for the unpaid excise taxes by making the documents needed to compute the true extent of his tax liability potentially unavailable to the administrative investiga-

tions because of Rule 6 and yet not expose McQueen to significant criminal liability.

**10.** Townsend deposed both Hughes and Pecht. During these depositions both Hughes and Pecht continuously maintained they were involved in no "industry-wide" investigation in which McQueen was the target.

**11.** After a thorough examination of Wong's and Hughes' time records, this court notes that Wong and Hughes carefully delineated which activities were part of the IRS investigation and which activities were part of the grand jury investigation. In short, those conducting the investigations acted as if there were two separate and distinct investigations—supporting this court's conclusion there was no merger.

occurred during any these discussions. Absent evidence to the contrary, this court sees nothing more than a log of routine meetings and activities conducted by IRS investigative agents in their pursuit of an entity suspected of criminally evading the payment of a tax. Again, this court notes that McQueen's failure to produce tangible evidence of a disclosure is not for his lack of trying and this court is of the opinion that additional discovery on the issue of what transpired during these meetings, conducted over ten (10) years ago, would serve little purpose.[12] No presumption of a violation of § 6103(h) is warranted. Accordingly for McQueen to state a § 6103(h) claim he must prove by a preponderance of the evidence that an actual disclosure tax returns or tax information occurred.

Without offering a shred of direct evidence in support his assertions and over the attested denials of the defendants and those not a party to this case, McQueen invites this court to adopt his inferences and presume that the investigations were merged, the defendant violated Federal Rule of Criminal Procedure 6(e), and that the defendant's activities were presumptively violations of 26 U.S.C. § 6103(d) and (h). Absent tangible evidence, this court cannot in good conscience accept such an invitation. This court finds that McQueen's inferences are nothing more than unsubstantiated conjecture and innuendo, and consequentially his version of the facts is not credible.

## III.

## DISCUSSION

### A. Summary Judgment

A motion for summary judgment will be granted if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party who, "may not rest upon the mere allegations or denials [in its] pleadings, but the [nonmoving] party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In determining the existence of a genuine issue for trial, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### 1. FOIA Action

 McQueen's FOIA claim is aimed at the DOJ, a distinct party from Wong, Hughes, and Pecht. Furthermore, the DOJ is not a party to McQueen's Rule 6 and Section 6103 claims. In the interests of justice, this court, in accordance Fed.R.Civ.P. 20(b), will sever the FOIA claim from the Rule 6(e) and Section 6103 claims in H–95–1453 and adjudicate it separately.

### 2. Rule 6(e) Action

McQueen claims that Wong, Hughes, and Pecht should be held in contempt of court and be required to pay damages for an al-

---

**12.** There is no evidence that what transpired during these meeting was in some way documented. The fact that McQueen conducted court supervised depositions of Hughes and Pecht which failed to produce any tangible evidence

leads this court to believe that taking Agent Wong's deposition as to what she might remember about a number of meetings held over 10 years ago would be an exercise in futility.

leged violation of Federal Rule of Criminal Procedure 6(e). FED.R.CRIM.P. 6(e) (West 1998). Rule 6(e) provides that, with the exception of certain specified circumstances, "matters occurring before the grand jury" are to be kept secret.[13] The purpose behind this rule is to:

1) prevent the escape of those whose indictment may be contemplated;

2) encourage crime witnesses to speak, knowing that their identity will not be revealed to the person against whom they are testifying;

3) avoid injury to the reputation of those accused, but not indicted of crimes;

4) encourage grand jurors to investigate suspected crimes without inhibition and to engage in unrestricted deliberations.

In re Grand Jury Investigation (Lance), 610 F.2d 202, 213 (5th Cir.1980) (citations omitted).[14] Rule 6(e)(2) further provides that a court may punish a knowing violation of Rule 6(e) by citing the offender for contempt of court. FED.R.CRIM.P. 6(e) (West 1998).

In Lance, a Georgia banker, was the target of a grand jury investigation for activities he was engaged during his association with National Bank of Georgia. Lance, 610 F.2d at 207. During the pendency of the grand jury investigation and before any indictments were returned, Lance charged that the AUSA conducting the grand jury and possibly several members of it purposefully leaked grand jury information to various newspapers and press information services. Id. at 208–10. These newspapers published the information and implied that the source of the leaks was the AUSA's office. Id.

Even though the supervising district court ordered the AUSA to eliminate the leaks, that order was only partially successful. Id. Subsequent leaks to the press contained both newly developed grand jury information and Lance's attempt to curtail the leaks. Lance, claiming harm from the leak petitioned the district court for three forms of relief: 1) that all persons associated with the grand jury probe be ordered to show cause as to why contempt sanctions should not be imposed; 2) that the court examine each member of the grand jury in camera to ascertain whether the juror violated the secrecy obligation of Rule 6(e); and 3) that the court imposing sanctions, up to and including the dismissal of the grand jury and barring the DOJ from indicting him, upon those responsible for the leaks. Id. at 211.

The Fifth Circuit held that Lance stated a prima facie case of a Rule 6(e) violation by offering tangible evidence[15] that grand jury information was leaked and that the source of the of the leaks was the AUSA's office. Id. at 220. The court further held that, because Lance had stated a prima facie case, he was entitled to an evidentiary hearing by the district court to show cause order why the AUSAs should not be held in contempt for violating the district court's order to stop the leaks. Id. at 220–221. Significantly, the Fifth Circuit construed Lance's motion as seeking civil, not criminal, contempt sanctions under Rule 6(e)(2) ("A knowing violation of Rule 6 may be punished as a contempt of court."). Id. at 212–213 (emphasis added).

■ This ruling has been interpreted as granting the target of a grand jury investigation a very limited right to seek injunctive relief or civil contempt of court through the district court supervising the grand jury. See Barry v. United States, 865 F.2d 1317, 1321 (D.C.Cir.1989).[16] Nowhere has Lance been interpreted as granting a grand jury target a private right of action to seek dam-

---

13. None of the parties maintain that any of the exceptions to the general secrecy requirement of Rule 6(e) are applicable in this case.

14. It follows that Rule 6(e) as it applies to this case, that the rule is not so concerned with McQueen's privacy as it is with keeping the actual grand jury process impartial and untainted. McQueen was not only indicted, but he pleaded guilty and was incarcerated.

15. Lance presented tangible evidence to the court in the form of newspaper articles which published details from the grand jury proceedings which would not be discovered absent a leak and which attributed the leaks to "someone close to the grand jury." Lance, 610 F.2d at 208–10.

16. See Blalock v. United States, 844 F.2d 1546 (11th Cir.1988); Finn v. Schiller, 72 F.3d 1182 (4th Cir.1996).

ages in an independent lawsuit. Other circuits which have addressed this issue, have concluded that a grand jury target has no independent private right of action for damages or even equitable relief for a Rule 6(e) violation. *Finn v. Schiller*, 72 F.3d 1182 (4th Cir.1996); *See also Blalock v. United States*, 844 F.2d 1546 (11th Cir.1988).[17] Also persuasive, is the Supreme Court's discourse on remedies for a Rule 6(e) violation:

> For example, a knowing violation of Rule 6 may be punished as a contempt of court. In addition the court may direct a prosecutor to show cause why he should not be disciplined and request the bar or the Department of Justice to initiate disciplinary proceedings against him. The court may also chastise the prosecutor in a published opinion. Such remedies allow the court to focus on the culpable individual rather than granting a windfall to the unprejudiced plaintiff.

*Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) (internal citation omitted). Again, there is no mention of a private right of action to sue for damages in an independent lawsuit for an alleged violation of Rule 6(e).

This court finds the reasoning in *Finn* and *Blalock* both persuasive and consistent with the Fifth Circuit's holding in *Lance* and therefore expressly adopts it.

#### a. Civil Damages

 On less favorable facts, and without tangible evidence that a Rule 6 violation even occurred, McQueen seeks relief far in excess of that which was granted by the Fifth Circuit in *Lance*. Unlike the grand jury target in *Lance*, McQueen offers no evidence of adverse media publicity surrounding the grand jury,[18] no evidence that anyone in the public even knew of any grand jury investigation which targeted him, and no evidence that the documents Wong and Hughes seized pursuant to the Colorado search warrant and shared with the STCO had been shown to the grand jury. In other words, he offers no tangible evidence that matters before the grand jury had been leaked. Instead, he asserts that he is entitled to a presumption that the parallel investigations were merged and consequently that he is entitled to a presumption that documents seized pursuant to the Colorado search warrant investigations are constructively "matters before the grand jury".

Also unlike *Lance*, where the target petitioned the supervising district court for relief

---

**17.** The 4th Circuit stated, "Although we find that the language of the rule provided both civil and criminal contempt, it does not follow that the rule creates a private [independent] cause of action. A claimant may notify the court of a violation of the rule or petition the court to investigate an alleged violation, but such complainant may not proceed by way of a civil action against the alleged violator. *[T]here is no such thing as an independent cause of action for civil contempt.*" *Finn*, 72 F.3d at 1188 (*emphasis added*, citations omitted).

In a case that is factually most analogous to the instant matter, the 11th Circuit in *Blalock v. United States*, specifically found that the target of a grand jury had no Rule 6(e) cause of action for equitable relief when there was an adequate remedy at law. *Blalock*, 844 F.2d at 1546. The target of a grand jury investigation filed a private suit to enjoin a impending indictment because the FBI agents working with the federal grand jury investigating fraud and bid rigging allegations were allegedly collaborating with a private investigation being conducted by Georgia Power Company. *Id.* at 1548. The court found that the proper remedy was to move the district court to dismiss the indictment. *Id.* at 1549. The court

noted that, in *Lance*, the Fifth Circuit held that a target has *the right to ask the district court* to require anyone wrongfully disclosing grand jury matters to show cause why he should not be held in civil contempt and sanctioned ... [thus giving] a target a right of action for injunctive relief against the members of the grand jury and prosecutors assisting them in their investigation. "We make this statement because *there is no such thing as an independent cause of action for civil contempt;* civil contempt is a device used to coerce compliance with an in personam order of the court which has been entered in a pending case." *Id.* at 1550 (*emphasis added*).

**18.** "First, there must be a clear indication that the media reports disclose information about matters occurring before the grand jury." *Lance*, 610 F.2d at 216 (internal quotation omitted, *emphasis added*); "It is generally understood that a *prima facie* case of a violation of Rule 6(e)(2) is made when *'the media reports disclosed information about 'matters occurring before the grand jury' and indicated that the sources of information included attorneys and agents of the Government.'*" *Barry v. United States*, 865 F.2d 1317, 1321 (D.C.Cir.1989) (*emphasis added*).

from the leaks of grand jury information, McQueen never complained to the supervising district court about any alleged leak of grand jury information. Instead, McQueen filed a series of independent civil suits seeking tort damages for what he claims was a sharing of information between the parallel state and federal investigations. By so doing, McQueen seeks not to correct an alleged leak but rather; to punish the defendants for their roles in the various investigations of McQueen's illegal activities by seeking actual and punitive damages to the tune of nearly $8,000,000.[19]

This court is also of the opinion that it would be bad policy to grant a private right of action for damages for a Rule 6 violation in an independent lawsuit. The recognition of such a right would be highly detrimental to our grand jury system in that it would chill the investigative power of the grand jury by exposing federal investigators and prosecutors and grand jury members to potentially ruinous civil liability and legal costs for defending suits filed for no other purpose than to harass and interfere with the grand jury process and those involved. It would also encourage the target of a grand jury investigation to sandbag the reporting of a leak to the supervising district court because it would be more advantageous to file an private civil suit seeking damages.[20] This would deprive the district court of the opportunity to investigate the complaint and correct any alleged violation.

Finally, because of our liberal discovery rules in civil suits, an independent suit would expose grand jury deliberations, the identity of grand jurors, and other grand jury matters to the public. This would not only inhibit the grand jury's deliberative process, it would potentially expose grand jury members, government lawyers and agents, and witnesses to outside pressures and possible danger. In short, it would eviscerate the very protections to the grand jury process Rule 6 was intended to provide.

McQueen offers no legal authority for a private right to seek civil and punitive damages for an alleged Rule 6(e) violation in an independent law suit and this court's extensive research could find none. Furthermore, McQueen makes no persuasive equitable or policy argument for the expansion of the narrow rights conferred by the *Lance* court.

On both the law and the facts of this case, the court is of the opinion that McQueen does not have a private right to seek damages for an alleged Rule 6 violation and that allowing him to proceed on this claim would be contrary to the Supreme Court's guidance from *Bank of Nova Scotia* and this court's express adoption of the holdings of *Barry, Finn,* and *Blalock. Supra.*

In light of the above, this court holds that McQueen states no claim for actual and punitive damages for the alleged violation of Federal Rule of Criminal Procedure 6(e) and therefore, his Rule 6 claim for damages must be dismissed with prejudice in accordance with Fed.R.Civ.P. 12(b)(6) and 56.

b. *Contempt of Court and Equitable Relief*

■ To obtain equitable relief in accordance with *Lance,* McQueen must first make

**19.** McQueen claims he was damaged [prejudiced] to the tune of nearly $8,000,000 as a result of alleged information sharing between the federal grand jury and a parallel state investigation of evasion of motor fuels taxes. His claim is premised on his assertion that the tax assessment levied by the State of Texas increased from approximately $275,000 to $8,000,000 as a result of the alleged information sharing. In short, McQueen is saying that if information had not been shared, the State of Texas Comptroller's Office would have not learned the true extent of his evasion of state motor fuels tax and his liability would have been limited to initial $275,000 assessment. In seeking a summary judgment granting these damages, McQueen, without offering a shred of tangible evidence as to the alleged information sharing, incredibly asks this court to: 1) accept his unsupported assertions and shift the burden to the defendants to show otherwise; 2) ignore the sworn testimony and evidence presented by the defendants to the contrary; 3); and 4) impose his huge state tax liability on Wong, Harris and Pecht.

**20.** Such independent suits can be used as a means to gain leverage in the target's criminal proceedings or as a means to collaterally attack an indictment or conviction in a subsequent suit.

This court can envision an all-to-realistic scenario in which the AUSA is placed in an intractable conflict of interest by having to bargain away the government's right to enforce its laws by prosecuting a grand jury target in exchange for a personal release of civil liability or to avoid the costs to defend an independent civil suit.

a *prima facie* showing of a Rule 6(e) violation. To do so, he must show a "clear indication" that the alleged disclosure concerned "matters occurring before a grand jury." *Lance,* 610 F.2d at 216. Lacking any real evidence, McQueen attempts to raise a presumption that all documents collected by Wong and Hughes pursuant to the Colorado search warrant were "matters before the grand jury" by citing to *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983), and *United States v. Baggot,* 463 U.S. 476, 103 S.Ct. 3164, 77 L.Ed.2d 785 (1983).

This court is wholly unpersuaded by McQueen's argument that *Baggot* and *Sells* resolve the issue of whether the documents Wong and Hughes seized pursuant to the Colorado search warrant were "matters occurring before a grand jury". On the facts alone, *Baggot* and *Sells* are distinguishable and thus, offer no support for McQueen's argument that the documents obtained pursuant to the Colorado search warrant were constructively matters before the grand jury.

■ In *Sells,* the grand jury indicted a corporation and two of its officers on two counts of conspiracy and nine counts of tax fraud. The defendants plead guilty to one count of conspiracy, and all the remaining charges were dismissed. Thereafter, the government moved for disclosure of all grand jury materials for use in commencing a possible civil suit against the defendants under

the False Claims Act. *Sells,* 463 U.S. at 421–22, 103 S.Ct. 3133. The Supreme Court held that the disclosure of such documents is permissible only with a court order issued upon the government's showing of particularized need.[21] *Sells* is distinguished on the facts from this case in that it was uncontrovertible that the *Sells* documents were literally "matters occurring before the grand jury" because they had actually been presented to the grand jury.[22] In contrast, McQueen presents no evidence that any of the documents Hughes and Wong showed the STCO were actually presented to the grand jury, instead he argues that the documents were constructively "matters before the grand jury" because the investigations were at least parallel if not merged.

Similarly, *Baggot* is distinguished from this case in that it also concerned documents which had *already been shown* to a grand jury and hence were undisputably "matters occurring before a grand jury".[23] *Baggot,* 463 U.S. at 477, 103 S.Ct. 3164. In this case the defendants have steadfastly denied that the documents shown to the STCO had been presented to Grand Jury I and McQueen has presented no evidence to the contrary.

■ This court having already held that the facts of this case show there was no merger between the STCO investigation, the IRS administrative investigation and Grand Jury I finds McQueen's contention that the documents were constructively "matters oc-

---

21. To Show particularized need, the government must demonstrate that: 1) the material sought is needed to avoid a possible injustice in another judicial proceeding; 2) the need for disclosure is greater than the need for continued secrecy; and 3) the request for documents is structured to cover only material so needed. *Id.* at 443; 103 S.Ct. 3133.

22. At issue in *Sells* was whether Rule 6(e)(3)(C)(i), which provides a specific exception for the broad secrecy requirement of Federal Rule of Criminal Procedure 6(e), was applicable to the case. Rule 6(e)(3)(C)(i) in pertinent part states: "Disclosure *otherwise prohibited by this rule* of matters occurring before the grand jury may also be made—when so directed by a court preliminarily to or in connection with a judicial proceeding." (*emphasis added*). The Supreme Court held that disclosure of "matters occurring before the grand jury" to government attorneys for use in a related civil suit is permissible only

with a court order under Rule 6(e)(3)(C)(i), and that the district court did not correctly apply the particularized-need standard for issuance of such an order. *Sells,* 463 U.S. at 442–43, 103 S.Ct. 3133.

23. In *Baggot,* the target of a special grand jury investigation, though never indicted, plead guilty to two counts of violating the Commodities Exchange Act. *Baggot,* 463 U.S. at 477, 103 S.Ct. 3164. Eight months later, the government filed a motion pursuant to Rule 6(e)(3)(C)(i), seeking disclosure of grand jury transcripts and documents to the IRS for use in an audit. *Id.* The Supreme Court held that the documents sought were not for use "preliminarily to or in connection with a judicial proceeding" because "the purpose of the audit is not to prepare for or conduct litigation, but to assess the amount of tax liability through administrative channels." *Id.* at 480, 103 S.Ct. 3164.

curring before the grand jury" wholly without merit. Furthermore, it is unpersuaded by McQueen's assertion that *Sells* and *Baggot* give rise to a presumption that when a grand jury investigation parallels a related court proceeding or administrative agency investigation, all information obtained in the court or administrative investigation are constructively "matters occurring before a grand jury".[24] None of the cases cited by McQueen support such a broad proposition and therefore, McQueen's reliance on these cases is misplaced. Lacking any legal presumption, McQueen may not rely on mere innuendo to meet his burden of demonstrating a "clear indication" that the documents were "matters occurring before a grand jury".

This court therefore, holds that McQueen has not met the burden of demonstrating a "clear indication" that the information which Wong and Hughes collected pursuant to the Colorado search warrant and which they shared with the STCO constituted "matters occurring before the grand jury". Consequently, McQueen has not made a *prima facie* showing that there was a Rule 6(e) violation which would entitle him to any injunctive relief.

■ Assuming *arguendo* that McQueen could, at this juncture, make *prima facie* case that a Rule 6(e) violation occurred, this court would be at a loss as to fashioning any sort of equitable relief. McQueen, who failed

to petition the supervising district court for relief at the time the alleged violation, points to no court order with which the defendants refused or failed to comply thereby justifying an order of contempt.[25] Similarly, there is no ongoing violation or behavior which would warrant an injunction. And, this court will not even consider disturbing McQueen's criminal conviction which was based upon his voluntary pleas of guilty to two counts of the indictment and to one count of the information.[26]

Despite McQueen's exhaustive arguments, he fails to offer "clear evidence" showing that the IRS administrative investigation and Grand Jury I were merged. His reliance on inference and innuendo does not raise a genuine issue of material fact, and therefore cannot defeat the defendants' Motion for Summary Judgment. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1442, n. 4 (5th Cir.1993) (party seeking to opposing summary judgment must adduce admissible evidence; unsubstantiated assertions of a dispute are not enough).

Accordingly, the defendants' Motion for Summary Judgment shall be granted, and McQueen's claims for damages and equitable relief for an alleged violation of FED. R.CRIM.P. 6(e) shall be dismissed with prejudice in accordance with FED.R.CIV.P. 12(b)(6) and 56.

---

24. McQueen also cites dictum from *In re Grand Jury Subpoena (Four Cases)*, 920 F.2d 235, 243 (4th Cir.1990) (*emphasis added*), for the proposition that *if a grand jury investigation and a parallel administrative IRS investigation are sufficiently merged,* documents uncovered in the parallel IRS investigation are grand jury matters. Though this court is not bound by the holding in *Four Cases*, it does note that the holding in *Four Cases* stands for the converse proposition, that if the grand jury investigation and the IRS administrative investigation are essentially independent, documents seized in the IRS investigation are not grand jury matters. *Id.* The court also notes the proposition is dependent on a finding that he investigations are sufficiently merged. *See emphasis.* The converse finding was made in this case.

25. This court's use of its contempt power against the defendants in this case, not coerce the defendants compliance with anything. Instead, would constitute a "criminal-like" punishment absent all of the due process safeguards.

26. McQueen and his lawyer Townsend admit that they were aware as early as mid-June, 1988 and certainly no later than February, 1991 (when the instant suit was filed), they were aware of the alleged Rule 6 violation. This court cannot understand why, in the two to five years between their learning of the alleged Rule 6 violation and McQueen's voluntary pleas of guilty to the criminal charges, McQueen and Townsend failed to petition the court to have the indictment quashed, or have the grand jury dismissed or have the court bar the government from indicting McQueen. Assuming there was a Rule 6 violation, the district court could, at the time, have fashioned an equitable remedy that would have both timely and effective. The fact that they pursued this untried parallel path is a prime illustration of the evils underlying this court's rationale for finding that no private right of action can exist for a Rule 6 violation.

### 2. Section 6103(d) and Section 6103(h) Claims

■ Title 26 United States Code § 6103 generally prohibits the disclosure of a tax-payers federal tax return information by, among others, any employee or official of the United States. 26 U.S.C. § 6103(a). A aggrieved taxpayer may bring a claim for a violation of § 6103 in the district court pursuant to 26 U.S.C. § 7431 provided that he brings the action within two-years from the date of discovery. 26 U.S.C. § 7341 (West 1997). Any recovery, however, will be denied if the IRS acted on a "good faith but erroneous interpretation" of § 6103. *Wilkerson v. United States,* 67 F.3d 112, 115 (5th Cir.1995); 26 U.S.C. § 7431(b).

#### a. *Section 6103(d) Claim*

Section 6103's general prohibition against disclosure of tax information is subject to certain exceptions contained within § 6103 itself. In particular, 26 U.S.C. § 6103(d) provides an exception for disclosure of tax returns and return information to state tax officials, provided that the following three conditions are met:

1) Such disclosures may be made only "for the purpose of, and only to the extent necessary in, the administration of" state tax laws [The Administration Requirement];

2) Such disclosures may be made only "upon *written request* of the head of" the state "agency, body or commission" charged with responsibility for the administration of state tax laws [The Written Request Requirement]; and

3) Such disclosures may be made only to individuals who are designated in the *written request* [*see* Condition 2, *supra* ] "as the individuals who are to inspect or receive returns or return information on

behalf of such agency, body or commission." [The Designation Requirement].

26 U.S.C. § 6103(d) (emphasis added).

There is no dispute that the Administration Requirement was satisfied. The defendants contend that the general request for tax information in section 3.2 of the Texas Coordination Agreement[27] satisfies the Writing and Designation Requirements. McQueen contends that the defendants' failure to follow certain procedures concerning the exchange of federal tax disclosure information in the Texas Implementation Agreement (TIA) indicates that the Writing and Designation Requirements were not complied with.

In *Smith v. United States,* the Seventh Circuit had an opportunity to address this issue on facts similar to those in this case.[28] *Smith v. United States,* 964 F.2d 630 (7th Cir.1992), *cert. denied,* 506 U.S. 1067, 113 S.Ct. 1015, 122 L.Ed.2d 162 (1993). The issue in *Smith* was whether the IRS Director complied with the Writing and the Designation Requirements. Smith argued that he did not because the IRS Director *"did not receive a specific, written request from the head of the IDR for information about Smith's tax status."* In response the government argued that two agreements between the IDR and the IRS, the Agreement on Coordination of Tax Administration (Coordination Agreement) and its corresponding Implementation Agreement constituted a standing Written Request. *Id.* at 632–33.

Like the Texas Coordination Agreement, the Illinois Coordination Agreement contained a blanket request for certain tax information. (Section 3.2 provided: "This agreement constitutes the requisite authorization pursuant to section 6103(d) to disclose ... Federal return information...."). *Id.* at 633. The Seventh Circuit held that this standing, blanket request complied with the

---

**27.** "This agreement constitutes the requisite authorization pursuant to section 6103(d)(1) of the Code for IRS to disclose to, and permit inspection by, an [STCO] Representative of Federal returns and Federal return information relating to taxes imposed by ... Chapter 32—Manufacturer's Excise Tax ... of the Code."

**28.** Plaintiff Smith was employed by the Illinois Department of Revenue (IDR) as a liaison official between the IDR and IRS. Smith was fired when the District Director of the IRS (IRS Director) informed the IDR Director that Smith did not file federal income tax returns for two years. *Id.* at 631.

Written Request Requirement. *Id.* at 634–65.

Furthermore, the Illinois Coordination Agreement did not designate a specific IDR individual entitled to receive information from the IRS; rather, it provided (as does the Texas Coordination Agreement) that "Agency Representatives" may receive information. *Id.* at 634. Nevertheless, the *Smith* court held that this designation, while phrased in general terms, satisfied the Designation Requirement. *Id.* The court explained, "Nothing in [§ 6103(d) ] suggests that the designation cannot be a general one, to be implemented by the head of the state tax agency in accord with the agency's internal procedural guidelines." *Id.*

The Seventh Circuit held that the legal effect of the Coordination agreement is not contingent upon the provisions of the Implementing Agreement and that the Coordination Agreement alone, fulfills the Written Request Requirement and trumps the Implementing Agreement. *Id.* at 635–36.

▮ This court finds the Seventh Circuit's reasoning in *Smith* persuasive.[29] Here, as in *Smith*, the legal effect of the Texas Coordination Agreement is not contingent on the TIA. The TIA was intended as an ancillary statement of procedures, rather than as general request for tax information pursuant to § 6103(d)(1). Therefore, this court is of the opinion that there is no genuine issue of material fact that Wong's and Hughes' disclosure of the materials seized pursuant to the Colorado search warrant satisfied the requirements of § 6103(d). It did as a matter of law.[30]

Accordingly, this court holds that Wong's and Hughes' disclosure to the STCO of the documents seized pursuant to the Colorado search warrant was conducted in accordance with the requirements 26 U.S.C. § 6103 and that McQueen states no cause of action for a violation thereof under 26 U.S.C. § 7431. Accordingly, the defendants are entitled to summary judgment in accordance with Fed. R.Civ.P. 56 and McQueen's § 6103(d) action shall be dismissed with prejudice.

b. *Section 6103(h) Action*

McQueen alleges that when Hughes contacted Pecht for approval of the Application for the Colorado search warrant, he violated 26 U.S.C. § 6103(h) by showing her the facts upon which probable cause was based. Section 6103(h) permits the IRS to disclose Federal return information to the DOJ only if three requirements are satisfied. First, the disclosure may be made only to a DOJ employee directly engaged in a judicial proceeding (or an investigation preceding such a proceeding), and solely for their use in the proceeding. Second, the disclosure must be related to such a proceeding in a way described in the statute, including, but not limited to, being a proceeding which arose "out of, or in connection with, determining the taxpayer's ... criminal liability." And third, an agent of the IRS may disclose on his own motion, where a case has been "referred" by the IRS to the DOJ. 26 U.S.C. § 6103(h) (West 1997). McQueen alleges that these three statutory requirements were not satisfied. This court disagrees.

▮ First, Hughes made the disclosure to Pecht solely for the purpose of helping the IRS obtain a search warrant pursuant to an IRS administrative investigation of a possible criminal violation of the IRS tax code. Second, when he made the disclosure, Hughes was investigating whether McQueen committed a criminal violation of the tax laws. Finally, the IRS "referred" the case to DOJ within the purview of § 6103(h).[31] This court

---

29. The Tenth Circuit also found the reasoning by the Seventh Circuit in *Smith* persuasive. See *Long v. United States*, 972 F.2d 1174, 1179–80 (10th Cir.1992).

30. The court also notes that the STCO subpoenaed these records from McQueen and would have taken possession of them pursuant to that subpoena had not McQueen tried to conceal them by moving them to Colorado. In short the STCO would legally have been in possession of any and all of McQueen's state and federal tax records that were in the Colorado documents without ever having had to request them from the IRS.

31. Though the term "referred" is not defined in the statute, the Joint Committee on Taxation stated that the Congress intended the term "referred case" to cover situations like the one in this case: "For purposes of [section 6103(h) ] the referral of a tax matter by the IRS to the Justice Depart-

finds no genuine issue of material fact that the disclosure of the information contained in the search warrant Application and Affidavit met the statutory requirements of § 6103(h).

 In his request for clarification of this court's first memorandum opinion, Townsend alleges that the numerous meetings between the defendants and the defendants and the FBI as § 6103(h) violations. *See Fn. 6, supra.* This court finds McQueen's assertion that Wong's and Hughes' discussions with the FBI regarding the surveillance of the Livingston Oil facilities (McQueen's company) constitutes a violation of § 6103(h) particularly specious. This court's examination of the Wong's and Hughes' records of these meetings reveal nothing more than routine meetings and activities conducted by IRS investigative agents in their pursuit of an entity suspected of evading the payment of a tax. No reasonable person can logically conclude that tax matters were disclosed during any these discussions. As with his other allegations McQueen, despite considerable discovery, offers no evidence in support of this allegation. Instead, he relies solely on conjecture and innuendo in an effort to continue this abusive litigation.

Finally, this court holds that, even if McQueen could show a violation of § 6103(h) his claim would be barred by the statute of limitations. 26 U.S.C. § 7341(d) (West 1997). Section 7341(d) provides that anyone aggrieved by a wrongful disclosure in violation of § 6103(h) must file suit within two years of the date of discovery of the unauthorized disclosure.

 In his deposition, McQueen's attorney, Townsend, testified that sometime between mid-June and mid-July 1988, he believed that Pecht possessed a copy of the Application and Affidavit for the search warrant. At that point, McQueen's lawyer is charged with having discovered the alleged

violation for the purposes of the two-year statute of limitations. By this court's generous computation, he had until July 1990 to file his claim or be forever barred. McQueen however, waited until February, 1991 which is clearly outside the time limit. Accordingly, McQueen's claim under § 6103(h) is time-barred.

This court holds that McQueen has failed to state any claim under 26 U.S.C. § 6103(h). Therefore, the defendants are entitled to summary judgment in accordance with Fed. R.Civ.P. 56 and McQueen's § 6103(h) claim shall be dismissed with prejudice.

### IV.

### CONCLUSION

For the reasons set forth above, the court will sever the FOIA claim, grant the defendants' Motion for Summary Judgment, and deny McQueen's Motion for Judgment as a Matter of Law, pursuant to Fed.R.Civ.P. 56 on the Rule 6(e) and all § 6103 claims before this court.

All relief not specifically granted herein will be denied.

Appropriate orders will be entered.

ment would *include those disclosures made by the IRS to the Justice Department in connection with the necessary solicitation of advice and assistance with respect to a case prior to a formal referral of the entire case* to the Justice Department for defense, prosecution or other affirmative action." Staff of Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976, 322 (1976), 1976–3 C.B.

(Vol.2) 334 (emphasis added.) Courts often rely upon the explanations of the Joint Committee in interpreting the federal tax code. *See Allison v. United States,* 701 F.2d 933, 940 n. 9 (Fed.Cir. 1983); *Estate of Ceppi,* 698 F.2d 17, 19 (1st Cir.1983); *Federal Power Commission v. Memphis Light, Gas & Water Div.,* 411 U.S. 458, 472, 93 S.Ct. 1723, 1731, 36 L.Ed.2d 426 (1973).