**IN RE: SEALED CASE NO. 98–3077.**

Nos. 98–3077, 98–3078, 98–3079 and 98–3081.

United States Court of Appeals, District of Columbia Circuit.

Argued July 21, 1998.

Decided Aug. 3, 1998.

Kenneth W. Starr, Independent Counsel, argued the cause for petitioner, with whom Donald T. Bucklin, Scott T. Kragie, and Andrew W. Cohen were on the petition and reply.

David E. Kendall argued the cause for respondent William J. Clinton, with whom Nicole K. Seligman, Max Stier, Robert S. Bennett, Carl S. Rauh, Amy Sabrin, Katharine S. Sexton, W. Neil Eggleston, William J. Murphy, and William Alden McDaniel, Jr., were on the response.

Before: WALD, SILBERMAN, and HENDERSON, Circuit Judges.

PER CURIAM:

The Independent Counsel (IC) petitions for a writ of mandamus directing the district court to vacate its orders authorizing [      ]* to subpoena documents from the IC, conduct limited depositions of the IC and his staff, and subpoena the IC and his staff for similarly limited testimony at a show cause hearing relating to alleged violations of the grand jury secrecy rule. We conclude that we have power to determine the issues presented by the petition; resolving those issues in a substantially different way than the district court did, we issue the writ.

## I.

■ [      ]¹ filed motions in the district court requesting that the court order Inde-

* Bold brackets signify sealed material.

1. [      ]

pendent Counsel Kenneth W. Starr to show cause why he, and/or his staff, should not be held in contempt for violation of Federal Rule of Criminal Procedure 6(e)(2), which prohibits attorneys for the government from disclosing confidential grand jury information.[2] The movants alleged that the IC and his staff had divulged such information to the press, and provided the court with several news reports about the investigation wherein a reporter describes the source of the information as, to quote one illustrative example, "a source close to Starr." Appendix to Opposition to Emergency Motion to Stay the District Court's Orders, at Tab 1 (Thomas Galvin, *Monica Keeping Mum—For Now Fends Off Query On Internal Affairs,* DAILY NEWS, Jan. 23, 1998, at 26). The district court held that such news reports established a *prima facie* case of a violation of Rule 6(e)(2) because the "media reports disclosed information about 'matters occurring before the grand jury' and indicated that the sources of the information included attorneys and agents of the Government." Order to Show Cause, Misc. No. 98–55 (June 19, 1998), at 2 (quoting *Barry v. United States,* 865 F.2d 1317, 1321 (D.C.Cir.1989)).

The district court read our decision in *Barry* as holding that once a *prima facie* violation of Rule 6(e)(2) is established, the court is *required* to conduct an adversarial hearing at which the prosecutor must show cause why he should not be held in contempt. Order to Show Cause at 9 (citing *Barry,* 865 F.2d at 1321). Accordingly, the district court issued the two procedural orders at issue in this petition. The court first scheduled a show cause hearing. Order to Show Cause at 10. In the second order, it clarified the nature of the show cause hearing. The IC was ordered to produce, on July 11, the documents requested by movants, with any Rule 6(e) material redacted.[3] The court ruled that movants would be permitted to depose the IC and several of his staff, prior

to the adversarial hearing, on three subject areas: (1) the IC's policy regarding press contacts, (2) actual contacts with the press by the IC or his staff, and (3) specific representations made by the IC about the first two subject areas. The court further ruled that movants could subpoena the IC and several of his staff for testimony at the show cause hearing, with the subject matter of the questioning to be limited in the same manner as during the depositions. Mem. Order, Misc. No. 98–55 (June 26, 1998), at 2. Finally, the court set forth the procedure to be followed at the show cause hearing: the hearing would begin with an *ex parte* presentation by the IC of any Rule 6(e) material the IC deems necessary to rebut the *prima facie* case; after the IC's presentation, movants' counsel would join the hearing, cross-examine the IC and his witnesses, and present their evidence. *See id.* at 4.

The IC filed a notice of appeal, followed by a motion for stay pending appeal. The district court subsequently declined to stay its orders, reasoning that the factors for granting a stay pending appeal were not met. Order, Misc. No. 98–55 (July 9, 1998). Specifically, the court found that the IC's likelihood of prevailing on the merits of its appeal was low given the court's conclusion that the orders are not even appealable; that the IC would not be irreparably harmed by the orders because the orders allowed him to redact any Rule 6(e) material and thus he would not be required to provide any confidential investigative material to movants; that the harm to movants of granting a stay was substantial because without an immediate show cause hearing, there would be no deterrence of future leaks in the interim before the appeal; and that the public interest in stopping leaks and in preserving respect for the judiciary's orders sealing grand jury proceedings outweighed any delay that

---

**2.** Rule 6(e) provides in relevant part: "[A]n attorney for the government ... shall not disclose matters occurring before the grand jury, except as otherwise provided in these rules.... A knowing violation of Rule 6 may be punished as a contempt of court." FED R.CRIM. P. 6(e)(2). The IC, as an "attorney for the government," is subject to the secrecy requirements of Rule

6(e)(2). *In re North,* 16 F.3d 1234, 1245 (D.C.Cir.1994).

**3.** Discovery of documents from the IC was initially scheduled to begin on June 30, 1998. At the request of the IC, the district court stayed the discovery order until July 11.

might be caused by the show cause hearing and its associated discovery process.

On July 9, 1998, the same day the district court denied the IC's motion for a stay pending appeal, the IC petitioned us for mandamus relief.[4] Because discovery was set to begin on July 11, we ordered an administrative stay of the district court's procedural orders so that we would have sufficient opportunity to consider the merits of the petition for writ of mandamus. Order, No. 98-3077 (July 10, 1998). We now conclude that we have power to determine the issues presented in the petition; based on our analysis of those issues, we issue the writ.

## II.

■ The writ of mandamus has been described as "an extraordinary remedy, to be reserved for extraordinary situations." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988) (citing *Kerr v. United States Dist. Court*, 426 U.S. 394, 402, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976)).[5] As we recently observed, liberal use of the writ would "undercut the general rule that courts of appeals have jurisdiction only over 'final decisions of the district courts,' 28 U.S.C. § 1291, and would lead to piecemeal appellate litigation." *In re Minister Papandreou*, 139 F.3d 247, 249 (D.C.Cir.1998). Not surprisingly, the extraordinary nature of mandamus relief is reflected in the strict criteria for its issuance: Mandamus will issue only if the peti-

tioner bears his "burden of showing that the petitioner's right to issuance of the writ is clear and indisputable," *Gulfstream*, 485 U.S. at 289, 108 S.Ct. 1133 (citation and internal quotation marks omitted), and that "no other adequate means to attain the relief" exist, *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). *See Papandreou*, 139 F.3d at 250.

### A.

■ We take the latter requirement first. Respondent, referring us to our opinion in *In re Kessler*, 100 F.3d 1015 (D.C.Cir.1997), urges that petitioner has an adequate alternative means to challenge the district court's discovery orders. As respondent correctly observes, we stated in *Kessler* that "in the ordinary case, a litigant dissatisfied with a district court's discovery order must disobey the order, be held in contempt of court, and then appeal that [final] order on the ground that the discovery order was an abuse of discretion." *Kessler*, 100 F.3d at 1015; *see also Papandreou*, 139 F.3d at 250 ("If held in contempt, a litigant then has a final order from which he may appeal, asserting any legal flaws in the underlying discovery order."); *In re: Sealed Case*, 141 F.3d 337, 339 (D.C.Cir.1998). Respondent argues that the disobedience and contempt path to appeal is an adequate means to relief, and that petitioner must therefore pursue it rather than seeking the extraordinary writ of mandamus.

4. Petitioner styles his petition a "Petition for Writ of Prohibition" rather than a "Petition for Writ of Mandamus." Because "the grounds for issuing the writs are virtually identical," *In re Halkin*, 598 F.2d 176, 179-80 n. 1 (D.C.Cir. 1979), and because "mandamus" is the more familiar term, we prefer to use it.

Petitioner simultaneously filed an emergency motion to stay the district court's orders pending appeal. Petitioner argues in that motion that we have jurisdiction to review the district court's orders—which he concedes are interlocutory— under the collateral order doctrine. Emergency Motion of the United States of America at 7 (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)). We have recently described the criteria for the collateral order doctrine and the writ of mandamus as "similar." *In re Minister Papandreou*, 139 F.3d 247, 250 (D.C.Cir.1998); *see also In re Kessler*, 100 F.3d 1015, 1016 (D.C.Cir.1997)

("In practical terms, the difference between the two, at least in this context [of review of a discovery order], is mainly semantic."). Ease of analysis, as will become clear in Part II.B. *infra*, dictates that we discuss petitioner's arguments using the framework for mandamus relief. *Cf. Papandreou*, 139 F.3d at 250 (discussing the criteria for both mandamus relief and the collateral order doctrine, and then embarking on an analysis framed solely in terms of mandamus without articulating a reason for preferring one framework over the other).

5. Statutory authority for issuing the writ of mandamus is provided by 28 U.S.C. § 1651 (1994): "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."

■ Unfortunately, in *Kessler, Papandreou,* and *In re: Sealed Case,* the parties did not bring to our attention a longstanding distinction between civil and criminal contempt orders issued against a party to a litigation. While a criminal contempt order issued against a party is considered a final order and thus appealable forthwith under 28 U.S.C. § 1291, *Bray v. United States,* 423 U.S. 73, 76, 96 S.Ct. 307, 46 L.Ed.2d 215 (1975); *Matter of Christensen Engineering Co.,* 194 U.S. 458, 461, 24 S.Ct. 729, 48 L.Ed. 1072 (1904); *SEC v. Simpson,* 885 F.2d 390, 395 n. 7 (7th Cir.1989), a civil contempt order issued against a party is typically deemed interlocutory and thus not appealable under 28 U.S.C. § 1291, *Fox v. Capital Co.,* 299 U.S. 105, 107, 57 S.Ct. 57, 81 L.Ed. 67 (1936); *Doyle v. London Guarantee & Accident Co.,* 204 U.S. 599, 27 S.Ct. 313, 51 L.Ed. 641 (1907); *International Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc.,* 849 F.2d 1481, 1484 (D.C.Cir.1988); *Duell v. Duell,* 178 F.2d 683, 687 (D.C.Cir.1949) (describing the rule as "thoroughly settled"); *In re Joint Eastern & Southern Districts Asbestos Litigation,* 22 F.3d 755, 765 (7th Cir. 1994). Indeed, we reaffirmed the rule that a civil contempt order issued against a party is not appealable as recently as *SEC v. Finnegan,* No. 97–5272, 1998 WL 65530, at *1 (D.C.Cir. Jan. 13, 1998).

The confusion in our caselaw may be a product of several factors. For one, the authoritative Supreme Court cases on these issues are rather old and are not frequently cited. For another, the distinction between civil and criminal contempt orders for purposes of appealability by a party has been criticized, *see Powers v. Chicago Transit Auth.,* 846 F.2d 1139, 1141 (7th Cir.1988) (noting that although "many modern commentators believe that the rule postponing review [of a civil contempt order issued against a party] is unduly harsh, . . . the rule is too well established to be changed by us."); 15B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3917, at 399–404 (2d ed.1992) (reviewing the policy debate on the merits of the distinction), especially in light of the different regime for nonparties that allows immediate appeals from orders of either civil or criminal contempt, *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 398 (5th Cir.1987); *United States v. Columbia Broadcasting System,* 666 F.2d 364, 367 n. 2 (9th Cir.1982) (citing cases). Most likely, our questionable assumption in *Kessler, Papandreou,* and *In re: Sealed Case* can be traced to an imprecise footnote from which we quoted: "As a general rule, a district court's order enforcing a discovery request is not a 'final order' subject to appellate review. A party that seeks to present an objection to a discovery order immediately to a court of appeals must refuse compliance, be held in contempt, and then appeal the contempt order." *Church of Scientology of Calif. v. United States,* 506 U.S. 9, 18 n. 11, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (citing *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971)). On its face, this passage suggests that any contempt order issued against a party, whether civil or criminal, is an appealable final order. But it is rather implausible that the Supreme Court, in dicta—not to mention in a footnote—meant to overrule *sub silentio* the holdings in *Fox* and *Doyle.* Moreover, the case relied on by the Supreme Court, *United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971), is inapposite. *Ryan* involved a recipient of a subpoena duces tecum issued by a grand jury, who sought to appeal from the district court's denial of a motion to quash the subpoena. The Court held that such an order is not appealable, and that appeal could only be taken from a contempt order that would follow from a refusal to produce the documents requested in the subpoena. *Id.* at 552, 91 S.Ct. 1580. It did not distinguish civil from criminal contempt, for there was no need to do so. The case involved a recipient of a grand jury subpoena, not a party-litigant, and so did not implicate the *Doyle* rule.

In any event, we need not definitively resolve the apparent conflict in our cases as to whether a civil contempt order issued in the context of an ongoing civil litigation is appealable as a final order. It is enough for us to observe that there is substantial doubt whether, if squarely presented with the issue, we would deem such a civil contempt order

appealable. Given a district court's discretion whether to hold a party who refuses to comply with a discovery order in civil or criminal contempt, "a party who wishes to pursue the disobedience and contempt path to appeal cannot know whether the resulting contempt order will be appealable." WRIGHT, MILLER & COOPER § 3914.23, at 146. The implication, of course, is that the disobedience and contempt route to appeal cannot be labeled an adequate means of relief for a party-litigant. So too here. The discovery order addressed to petitioner arises out of a civil proceeding ancillary to a grand jury investigation, *Barry*, 865 F.2d at 1321–22, and petitioner is properly characterized as a party in that civil proceeding. Petitioner cannot know, *ex ante*, whether refusal to comply with the discovery order will result in a civil contempt order or a criminal contempt order. The uncertainty of this means to relief bespeaks its inadequacy in this case.

■ Our conclusion that the disobedience and contempt path to appeal is inadequate does not answer whether some other means to relief—besides the writ of mandamus—is adequate for petitioner. Presumably, a civil contempt order, if issued against petitioner at the *conclusion* of the ancillary civil proceeding, would constitute a final order, appealable under 28 U.S.C. § 1291; it would not be like the civil contempt orders we discussed above that arise in the course of an ongoing litigation. The Rule 6(e)(2) ancillary civil proceeding we established in *Barry* is a peculiar creature in this regard; the *raison d'être* of the proceeding is a determination by the district court whether or not to hold the prosecutor in civil contempt. Respondent argues, therefore, that petitioner must wait until the conclusion of this ancillary civil proceeding and, if found in civil contempt at that point, seek to appeal the discovery orders.

The inadequacy of this alternative is apparent upon consideration of the nature of the harm that petitioner alleges will occur if we allow the procedural orders to stand. Petitioner contends that if he discloses [ ] the grand jury's investigation may be irreparably harmed. In this respect, petitioner is asserting something akin to a privilege insofar as "once [the] putatively protect-

ed material is disclosed, the very right sought to be protected has been destroyed." *In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir.1997) (citation omitted); *see also Papandreou*, 139 F.3d at 251 ("Disclosure followed by appeal after final judgment is obviously not adequate in such cases—the cat is out of the bag."). Although we have not had occasion to address the issue of irreparable harm to law enforcement from disclosure of arguably "privileged" material in the context of a mandamus petition, our sister circuits have concluded that such harm renders appeal after final judgment an inadequate means to relief from the discovery order. *See In re Department of Justice*, 999 F.2d 1302, 1305 (8th Cir.1993) (district court had ordered the FBI to turn over documents compiled for law enforcement purposes and assertedly privileged under FOIA, which, if released, would have irreparably harmed ongoing law enforcement proceedings); *In re Attorney Gen. of the United States*, 596 F.2d 58, 60 (2d Cir.1979) (district court had ordered the Attorney General to release files disclosing the names of confidential government informants, arguably protected under the informant's privilege and which, if released, might have had immediate adverse effects on law enforcement and intelligence-gathering).

Petitioner submits, moreover, that the district court's procedural orders, because they involve discovery and an adversarial hearing, will cause significant delay to petitioner's grand jury investigation as compared to the proposed alternate procedure of an *ex parte* presentation to the district court or a special master. In this respect, too, the type of harm petitioner alleges is irreparable: the burden of discovery and of the adversarial hearing is immediate and could not be recompensed were petitioner successful in appealing the procedural orders as part of an appeal from a final judgment of civil contempt. Petitioner, in effect, is claiming an immunity from discovery and adversarial process while the grand jury investigation is in progress. Thus, this case is similar to *Papandreou*, 139 F.3d at 250, in which we observed, in the course of issuing a writ of mandamus to vacate discovery orders implicating sovereign immunity, that the infliction of the "burdens" of discovery might cause

irreparable harm to one who asserts an immunity from those very burdens.

■ Finally, respondent contends, relying on our decision in *In re United States*, 872 F.2d 472 (D.C.Cir.1989), that the IC has the alternative remedy of seeking relief from the district court from discovery that the IC is able to demonstrate will disclose grand jury or investigative secrets. In *In re United States*, the district court had expressed a willingness to determine *in camera*, item-by-item, whether the state secrets privilege protected from discovery certain materials requested by a plaintiff suing the government under the Federal Tort Claims Act, and to allow the government to redact names from certain documents. We denied the government's petition for mandamus, in part because "[t]he district court did not reject the Government's assertion of privilege; on the contrary, ... the court demonstrated a perceptive understanding of and wholesome respect for the state secrets privilege." *Id.* at 478. Respondent argues that the district court here has demonstrated a similar willingness to accommodate petitioner's concerns about the confidentiality of the grand jury investigation: the district court has ordered that "discovery [is] restricted to matters not covered by Rule 6(e)," Mem. Order (June 26, 1998), at 2, and that "[i]f it becomes necessary for the OIC to present material covered by Rule 6(e) during the [show cause] hearing, the OIC may submit it to the Court at a bench conference or by other appropriate means," *id.* at 4.

We think, however, that unlike the district court's procedural protections in *In re United States*, the district court's safeguards here do not go far enough to assure us that the district court will protect the confidentiality interests of the IC. For example, even if the IC redacted the content of communications with members of the press to omit grand jury material, the residual information regarding the identity of the contact and the time such contact was made would give rise to inferences about the substance of "matters occurring before the grand jury." Furthermore, the IC is not troubled solely by the possibility that Rule 6(e) material might be disclosed, but also by the prospect of disclosing even the identities of members of the press with whom the IC and his staff have spoken [    ]. The district court's order does not accommodate this concern. Rather, it explicitly designates "actual contacts with the press by OIC employees," Mem. Order (June 26, 1998), at 2, as one of the subject areas on which respondent will be permitted to question petitioner and his staff by deposition and at the show cause hearing. And the district court's order does not assuage petitioner's fear that discovery and an adversarial hearing will divert petitioner's focus—significantly more so than would an *ex parte* presentation—from directing the grand jury investigation at a crucial juncture.

## B.

■ That petitioner has no adequate means of relief besides mandamus does not conclude our inquiry into whether we have power to address the merits presented by the petition. We must further determine whether petitioner has carried his "burden of showing that [his] right to issuance of the writ is clear and indisputable." *Gulfstream*, 485 U.S. at 289, 108 S.Ct. 1133 (citations omitted); *see also Papandreou*, 139 F.3d at 250. On its face, this criterion is somewhat circular. The right to issuance of the writ must be "clear and indisputable," but criteria for determining whether a petitioner has a right to issuance of the writ at all—let alone one that is clear and indisputable—are conspicuously absent from this formulation.

The Supreme Court in *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), described one category of cases for which mandamus is appropriate, a category into which we think the case at bar fits exactly. In *Schlagenhauf*, the district court, pursuant to Federal Rule of Civil Procedure 35, ordered a defendant in litigation arising out of a bus accident to submit to mental and physical examinations by several doctors. The defendant petitioned the Seventh Circuit to issue a writ of mandamus vacating the district court's order, claiming that Rule 35 authorized mental and physical examinations only of plaintiffs, not defendants. Whether Rule 35 could be applied to a defendant was a "basic, undecided ques-

tion"; only one federal case had touched on the issue, and only one state case had ever ordered the mental or physical examination of a defendant. *Id.* at 110, 85 S.Ct. 234. The Seventh Circuit thought it had power to review the question presented by the petition. The Supreme . Court agreed, holding that "the petition was properly before [the Seventh Circuit] on a substantial allegation of usurpation of power in ordering *any* examination of a defendant, an issue of first impression that called for the construction and application of Rule 35 in a new context." *Id.* at 111, 85 S.Ct. 234 (emphasis added). We have described *Schlagenhauf* as authorizing consideration of a petition for writ of mandamus "when the appellate court is convinced that resolution of an important, undecided issue will forestall future error in trial courts, eliminate uncertainty and add importantly to the efficient administration of justice." *Colonial Times, Inc. v. Gasch,* 509 F.2d 517, 524 (D.C.Cir.1975).[6]

The appropriate procedural framework for the Rule 6(e)(2) ancillary civil proceeding we recognized in *Barry* is as "important" and "undecided" today as was the proper interpretation of Rule 35 at the time *Schlagenhauf* arose in 1964. We provided scant guidance in *Barry* on the proper conduct of the Rule 6(e)(2) proceeding. And although the Eleventh Circuit has set forth in significant detail a procedural framework for a Rule 6(e)(2) proceeding akin to the one we recognized in *Barry, see United States v. Eisenberg,* 711 F.2d 959, 964 (11th Cir.1983), it is the only case we could find that has done so. The importance of the grand jury to the enforcement of the federal criminal law is well documented, and the impact on an ongoing grand jury investigation of a burdensome discovery process and adversarial hearing, through which [     ] learn of confidential investigative material—even if not Rule 6(e) material—could be profound. Accordingly, we have power "to determine . . . the issues presented by the petition for mandamus," *Schlagenhauf,* 379 U.S. at 111, 85 S.Ct. 234, and we turn to the merits to evaluate wheth-

er petitioner has a clear right to the issuance of the writ.

## III.

### A. The Nature of the Proceeding

In this circuit, the scope and nature of proceedings to enforce Rule 6(e)(2) are governed by our opinion in *Barry.* In *Barry,* we outlined the basic framework governing actions brought under Rule 6(e)(2):

> It is generally understood that a *prima facie* case of a violation of Rule 6(e)(2) is made when the media reports disclosed information about "matters occurring before the grand jury" and indicated that the sources of the information included attorneys and agents of the Government. Once a *prima facie* case is shown, the district court must conduct a "show cause" hearing to determine whether the Government was responsible for the preindictment publicity and whether any information disclosed by the Government concerned matters occurring before the grand jury. At this hearing, the burden shifts to the Government to come forward with evidence to negate the *prima facie* case. If after such a hearing the trial court determines that remedial action is warranted, it may order the Government to take steps to stop any publicity emanating from its employees.

*Barry,* 865 F.2d at 1321 (citations, footnote, and internal quotation omitted). *Barry* thus envisions that a two-step analysis will be employed to determine whether a violation of Rule 6(e)(2) has occurred. First, the district court must determine whether the plaintiff has established a *prima facie* case. This determination will typically be based solely on an assessment of news articles submitted by the plaintiff; indeed, we acknowledged in *Barry* that a Rule 6(e)(2) plaintiff could not be "expected to do more at this juncture of the litigation" given that he or she would "almost never have access to anything beyond the words of the [news] report." *Id.* at 1326 (internal quotation omitted) (alteration

---

6. *See also In re Department of Justice,* 999 F.2d at 1305 (holding that power to determine the issues presented in a writ of mandamus is conferred when a "case presents a unique situation"); *In re*  *Attorney Gen.,* 596 F.2d at 64 (issuing the writ of mandamus in part because of "the underlying issues of first impression" presented in the petition).

in the original).[7] Second, if the court determines that a *prima facie* case has been established, the burden shifts to the government to "attempt to explain its actions" in a show cause hearing. *Id.* at 1325. If the government fails to rebut the *prima facie* case, a violation of Rule 6(e)(2) is deemed to have occurred. *Cf., e.g., Duplan Corp. v. Deering Milliken, Inc.,* 540 F.2d 1215, 1220 (4th Cir.1976) (noting that a *prima facie* showing "subject[s] the opposing party to the risk of nonpersuasion if the evidence as to the disputed fact is left unrebutted"). The court then determines what remedy will be sufficient to deter further leaks. The remedy may be the imposition of civil contempt sanctions or equitable relief or both, "depending upon the nature of the violation and what the trial court deems necessary to prevent further unlawful disclosures of matters before the grand jury." *Barry,* 865 F.2d at 1323. Significantly, in establishing this two-step framework, *Barry* said nothing about the burden shifting back to the plaintiff after the government's presentation or about the plaintiff retaining the burden of persuasion after a *prima facie* case has been established. *See id.* (noting that purpose of show cause hearing is to permit the government to respond; "if the Government fails in its defense," the trial court should consider appropriate relief); *cf. Combs v. Ryan's Coal Co., Inc.,* 785 F.2d 970, 984 (11th Cir.1986) ("The party seeking the contempt citation retains the ultimate burden of proof...."). Under *Barry,* then, the plaintiff's burden is minimal; the responsibility of coming forward with evidence to rebut the accusation of unauthorized disclosure lies squarely with the government, the party in "the best position to know whether [it is] responsible for a violation of the Rule." *Barry,* 865 F.2d at 1326 (internal quotation omitted). If, of course, the government convinces the trial judge that no violation of Rule 6(e)(2) has occurred, that is the end of the proceeding.

██ Here, the IC does not contest the district court's finding that the movants have satisfied their burden to establish a *prima facie* case through the submission of various news articles indicating that information relating to grand jury proceedings or witnesses was obtained from sources associated with the IC or that a show cause hearing is now required under *Barry.* The IC does, however, object strenuously to the discovery procedures set forth by the district court in its order governing the conduct of the show cause hearing—in particular, the requirement that the IC be required to produce documents sought by the movants, submit to depositions of employees listed by the movants, and respond to subpoenas for live testimony at the hearing. (The IC has stated his willingness, however, to submit any information or testimony in any form required to the district court in an *in camera* proceeding.) The only issue before us, it is worth emphasizing, is not whether a show cause hearing will go forward in the district court as to whether the IC or members of his staff have made unauthorized disclosures to the press but rather the manner in which the hearing will be conducted: as a full-scale adversarial evidentiary proceeding or as an *in camera* inquiry by the trial judge and/or any special master or counsel it might appoint to assist the court in the task. Our review of the district court's orders is a fairly deferential one. In general, district courts are accorded a wide degree of latitude in the oversight of discovery-related proceedings, and we review orders pertaining to discovery only for abuse of discretion. *See, e.g., Laborers' International Union of North America v. Department of Justice,* 772 F.2d 919, 921 (D.C.Cir. 1984) ("Control of discovery is a matter entrusted to the sound discretion of the trial courts."). We are acutely aware that in this matter in particular the job of supervising the grand jury has been an arduous one requiring many interventions by the trial court, which has met its duties with admira-

---

7. To be sure, the plaintiff's burden in a Rule 6(e)(2) proceeding is relatively light. The articles submitted need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government; in fact, "[i]t is not necessary for [an] article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection." *Barry,* 865 F.2d at 1325 (internal quotation omitted). Of course, should a Rule 6(e)(2) plaintiff be in possession of evidence of a violation other than the articles themselves, that evidence should be submitted as part of the *prima facie* case.

ble dedication and expedition. Nonetheless, the appropriate procedure for a Rule 6(e)(2) hearing is a matter of grave importance, not only for this proceeding but for future ones, involving the need to protect the secrecy of the grand jury itself as well as the need to efficaciously remedy violations of that secrecy prohibited by Rule 6(e)(2). Accordingly, in this opinion we will lay down what we conclude is the appropriate way to conduct such a show cause proceeding.

*Barry* itself provided little in the way of a roadmap to assist the district court in proceeding once a *prima facie* case is made, that is, it did not address the specifics of how the show cause hearing should be conducted. It did not, for example, indicate whether the hearing should be open to the public or sealed, whether or to what extent discovery should be permitted and by whom, whether the hearing should include live testimony or rely solely on documentary evidence, or how to minimize any risk that the hearing will result in the disclosure of Rule 6(e) material to unauthorized recipients. In order to resolve these critical questions, we must balance two somewhat competing concerns, both of which lie just beneath *Barry*'s surface. We begin with the recognition that *Barry* held that a proceeding to enforce the secrecy mandate of Rule 6(e)(2) is civil in nature and may be initiated by a private plaintiff.[8] The movants in this proceeding have, however, seized on this "civil" characterization to argue that, pursuant to the Federal Rules of Civil Procedure, which generally govern civil actions for civil contempt, *see* 3 CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 705 (1982),[9] they are entitled to broad discovery against the IC, including the opportunity to require production of and to review documents from the IC and to subpoena and question the IC and members of his staff about the alleged unauthorized disclosures involved in the news articles that formed the basis of the *prima facie* case.[10] *See, e.g., Degen v. United States,* 517 U.S. 820, 825–26, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (noting that in a civil case, "a party is entitled as a general matter to discovery of any information sought if it appears 'reasonably calculated to lead to the discovery of admissible evidence' ") (quoting FED. R. CIV. P. 26(b)(1)).[11] In most proceedings characterized as "civil," this would certainly be the case: An overriding interest in the revelation of truth creates a need for free and open access to evidence; indeed, we have called it a "hallmark of our adversary system that we safeguard party access to the evidence tendered in support of a requested court judgment" and noted that the "firmly held main rule" is that "a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions." *Abourezk v. Reagan,* 785 F.2d 1043, 1060–61 (D.C.Cir.1986), *aff'd*

---

8. In this respect, we are aligned with the Fifth and Eleventh Circuits, *see In re Grand Jury Investigation (Lance v. Department of Justice),* 610 F.2d 202 (5th Cir.1980); *U.S. v. Eisenberg,* 711 F.2d 959 (11th Cir.1983), and have taken a different view from that later reached by other courts, *see Finn v. Schiller,* 72 F.3d 1182 (4th Cir.1996) (Rule 6(e)(2) provides for civil or criminal contempt remedy but may not be initiated by private plaintiff); *In re Grand Jury Investigation (90–3–2),* 748 F.Supp. 1188 (E.D.Mich.1990) (Rule 6(e)(2) provides only for criminal contempt remedy).

9. Because the Federal Rules of Civil Procedure generally govern civil contempt proceedings, it is arguable that a Rule 6(e)(2) proceeding must be initiated by complaint and not by motion, *see* FED. R. CIV. P. 3 ("A civil action is commenced by filing a complaint with the court"), and must first request injunctive relief before seeking contempt sanctions, *see Blalock v. United States,* 844 F.2d 1546, 1550 (11th Cir.1988) ("[T]here is no such thing as an independent cause of action for

civil contempt; civil contempt is a device used to coerce compliance with an in personam order of the court which has been entered in a pending case."); *but see Barry,* 865 F.2d at 1324 n. 7 ("[A] civil contempt sanction may *include* appropriate equitable relief."). Because the IC has not raised either of these concerns below or before this court, we will not consider them further here.

10. Indeed, the movants' motion to the district court requesting discovery asserted that it was unnecessary for them to secure the court's permission to commence civil discovery. *See* Memorandum in Support of Motion for Production of Documents and Testimony (June 19, 1998), at 2.

11. Of course, a district court retains the discretion "to control any discovery process which may be instituted so as to balance [the plaintiff's] need for access to proof ... against the extraordinary needs of [the government] for confidentiality." *Webster v. Doe,* 486 U.S. 592, 604, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

*by an equally divided court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987) (citations omitted). Exceptions to this rule are few and narrow. *Id.*

■ We ultimately conclude, however, that the unique nature of a Rule 6(e)(2) show cause hearing requires such an exception. This is not a typical civil proceeding between two disputants; rather, it resembles more clearly an ancillary proceeding to a criminal grand jury inquest. To the extent that sanctions are requested to deter future leaks (and the remedy is thus prospective and prophylactic, rather than retrospective and punitive), a Rule 6(e)(2) action is indeed civil in nature. *See Barry,* 865 F.2d at 1324; *see also Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (civil contempt sanctions are "remedial, and for the benefit of the complainant," while criminal contempt sanctions are "punitive, to vindicate the authority of the court"). But the way in which the proceeding is conducted must acknowledge the essential nature of the proceeding as one designed to guard the sanctity of the grand jury process itself. Thus, *Barry* describes a Rule 6(e)(2) plaintiff as having only "a very limited right to seek injunctive relief or civil contempt of court through the district court supervising the grand jury." *McQueen v. United States,* 5 F.Supp.2d 473, 482 (S.D.Tex.1998) (citing *Barry*). The plaintiff in a Rule 6(e)(2) suit would not, of course, be entitled to seek monetary damages or attorneys' fees and costs from an errant prosecutor, even though such damages are commonly awarded in civil contempt actions. *See, e.g., Clark v. Library of Congress,* 750 F.2d 89, 103 (D.C.Cir.1984) (holding that sovereign immunity "bar[s] suits for money damages against officials in their official capacity absent a specific waiver by the government") (emphasis omitted); *see also Barry,* 865 F.2d at 1321–22 (noting only that Rule 6(e)(2) permits "equitable relief, either in addition to, in conjunction with or in lieu of contempt sanctions"); *McQueen,* 5 F.Supp.2d at 482 (monetary damages unavailable under Rule 6(e)(2)); *cf. United States v. Waksberg,* 112 F.3d 1225, 1226 (D.C.Cir.1997) ("One of the permissible purposes of civil contempt sanctions is to compensate the complainant for losses sustained, through a fine payable to the complainant.") (internal quotation omitted); *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 103 F.3d 1007, 1017 n. 14 (D.C.Cir. 1997) (same as to fees and costs). In truth, like a habeas corpus proceeding, a Rule 6(e)(2) civil action is something of a hybrid: although initiated by a private plaintiff, it is designed to be a supplementary means of enforcing the rules of a criminal proceeding. *Cf. Santana v. United States,* 98 F.3d 752, 754 (3d Cir.1996) (noting that the nature of habeas corpus cases is "not adequately captured by the phrase 'civil action'; they are independent civil dispositions of completed criminal proceedings"). A Rule 6(e)(2) proceeding, dealing as it does with the substance of an ongoing criminal grand jury investigation, must be fully cognizant of the interests underlying that concurrent criminal proceeding.

The Supreme Court "consistently ha[s] recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings," *Douglas Oil Co. of California v. Petrol Stops Northwest,* 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), "a long-established policy ... older than our Nation itself," *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959) (internal quotation omitted). Rule 6(e)(2), by reinforcing this need for secrecy, protects several interests of the criminal justice system:

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil,* 441 U.S. at 219, 99 S.Ct. 1667. Thus, there are obvious risks of disclosure of grand jury material posed by translating normal discovery techniques or routine cross-examination of witnesses by all participating parties into Rule 6(e)(2) proceedings. Because a violation of Rule 6(e)(2) requires that the disclosure concern "matters occurring before the grand jury,"[12] *see Barry,* 865 F.2d at 1321; FED. R.CRIM. P. 6(e)(2), the IC may defend against an allegation of an unauthorized disclosure in the press by asserting that the information reported is, in fact, *not* a matter before the grand jury. In order to do so, however, he may well need to explain what material was before the grand jury.[13] Even the fact that the "leaked" material was not relevant to the investigation could itself be quite revealing, and certainly admissions that grand jury material was disclosed would be useful to witnesses who might be recalled. The possibility that document production, depositions, and cross-examination of government prosecutors would result in a disclosure of Rule 6(e) material clearly increases the risk of "[a greater] number of persons to whom the information is available (thereby increasing the risk of inadvertent or illegal release to others), [and thus] renders considerably more concrete the threat to the willingness of witnesses to come forward and testify fully and candidly." *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 432, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983) (rejecting automatic disclosure of grand jury materials to government civil attorneys). Moreover, if discovery and examination of government witnesses through depositions and in court were routinely available in Rule 6(e)(2) suits, targets and witnesses would surely be en-

couraged to bring such proceedings in the hope. of obtaining information as to the course of the grand jury's investigation whenever the relatively low threshold of a *prima facie* case attributing the source of a "leak" to the prosecutor was met. *Cf. id.* at 432, 103 S.Ct. 3133 ("If prosecutors in a given case knew that their colleagues would be free to use the materials generated by the grand jury for a civil case, they might be tempted to ... start or continue a grand jury inquiry where no criminal prosecution seemed likely."). The advantage of cross-examining government agents involved in an ongoing investigation about whether a "leak" of grand jury information has occurred cannot be overstated, particularly in cases of large-scale public interest. At the very least, if discovery or cross-examination in a Rule 6(e)(2) proceeding were allowed to proceed along its usual course, it would almost certainly result in the release of the names of the government agents involved in the investigation as well as the names of members of the press with whom they have been in contact [       ]. Short of a blanket denial of any press contacts at all, it would seem to us to be virtually impossible for IC personnel to answer movants' questions about whom they talked to, where, and about what without disclosing details of the investigation that tread perilously near to or in fact step over the line into areas of grand jury secrecy. Even if the specifics of information discussed with members of the press were redacted to omit grand jury material (and it is hard to see what use the questioning would be if the answers were so limited), the fact that the redaction was made at all would give rise to inferences about the substance

---

12. Although we have recently noted in a case involving the rights of the media to gain access to district court hearings and pleadings related to the grand jury's investigation that the phrase "matters occurring before the grand jury" encompasses "not only what has occurred and what is occurring, but also what is likely to occur," including "the identities of witnesses or jurors, the substance of testimony as well as actual transcripts, the strategy or direction of the investigation, the deliberations or questions or jurors, and the like," *In re Motions of Dow Jones & Co.,* 142 F.3d 496, 500 (D.C.Cir.1998), *petition for cert. filed,* 66 U.S.L.W. 3790 (U.S. June 3, 1998) (No. 97–1959) (internal quotation omitted),

we note here the problematic nature of applying so broad a definition, especially as it relates to the "strategy or direction of the investigation," to the inquiry as to whether a government attorney has made unauthorized disclosures.

13. We recognize that the district court's orders restricted discovery to "matters not covered by Rule 6(e)," but given that the disclosure of Rule 6(e) material is at the heart of this case, we find it impossible to imagine how any meaningful discovery regarding leaks could take place that would not involve the disclosure of some Rule 6(e) material.

of grand jury material when put together with the context of the answer and the identity of the media representative who authored it. Moreover, even if certain information discussed with members of the press regarding the course of the investigation, such as investigative leads ultimately not pursued, was considered not to be "matters occurring before the grand jury" and thus would not be subject to redaction, its revelation would still provide useful clues as to the direction of the prosecutors' efforts. In sum, we cannot envision how a useful inquiry could be conducted about what the IC or members of his staff told the press about certain matters relevant to the grand jury's investigation without disclosing the focus of the investigation (or, minimally, the areas or individuals not being focused on).[14] We must conclude, therefore, that the drafters of Rule 6(e)(2) intended that proceedings to ferret out violations of the grand jury secrecy rule should not themselves present an undue risk of compromising that very secrecy. *See, e.g., McQueen,* 5 F.Supp.2d at 484 ("[L]iberal discovery rules in civil suits ... would expose grand jury deliberations, the identity of grand jurors, and other grand jury members to the public. This would not only inhibit the grand jury's deliberative process, it would potentially expose grand jury members, government lawyers and agents, and witnesses to outside pressures and possible danger. In short, it would eviscerate the very protections to the grand jury process Rule 6 was intended to provide."); *Blalock,* 844 F.2d at 1559 n. 19 (Tjoflat, J., specially concurring) (inquiry into status of grand jury's investigation, "especially when conducted in the context of an adversarial civil contempt proceeding, would inevitably lead to the disclosure of grand jury matters, the very vice Rule 6(e)(2) was designed to avoid"); *Donovan v. Smith,* 552 F.Supp. 389, 390 (E.D.Pa.1982) (denying defendants' request to depose lead government attorney and thereby "intrud[e] into his knowledge regarding the prosecution of this action").

There is a further impediment to treating a Rule 6(e)(2) proceeding in all respects like a typical civil adversarial proceeding. It would almost certainly engage the district court and the prosecutor in lengthy collateral proceedings and in so doing divert the grand jury from its investigation. How, for instance, could counsel for a Rule 6(e)(2) plaintiff be permitted to engage in discovery and in-court examination of government witnesses without granting the government's attorney a similar opportunity to depose movants' counsel, movants' associates, and, indeed, the movants themselves if they could be shown to have relevant information about how the leaks really occurred? After all, if the government seeks to prove that it is not the source of the information reported, it has an interest in identifying the true source. By setting forth a simple, two-step framework, we believe *Barry* sought to achieve a swift resolution of an alleged Rule 6(e)(2) violation and to put an immediate stop to any leaks while not unduly interfering with the work of the grand jury with a full-blown sidebar trial on the Rule 6(e)(2) issue. *See Barry,* 865 F.2d at 1326 (show cause hearing "carries little threat of conflict with the grand jury proceedings") (internal quotation omitted); *cf. United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) ("Any holding that would saddle a grand jury with minitrials ... would assuredly impede its investigation and frustrate the public's interest in fair and expeditious administration of the criminal laws."); *Eisenberg,* 711 F.2d at 966 (targets should not be permitted access to information that "would permit them to embark upon a broad scale investigation of their own").

Given the lack of guidance in *Barry* on how to conduct the rebuttal phase of a Rule 6(e)(2) inquiry, it is not surprising that the district court proceeded as it did. Nevertheless, we believe that the risks of even inadvertent disclosure of grand jury matters and the specter of unnecessary detraction from the main business of the grand jury's investigation are simply too serious to allow the

---

**14.** While we cannot permit the IC's assertions of risk to the grand jury to act as an impenetrable shield against the progress of a Rule 6(e)(2) investigation, we must give some credence to his assertions, since we are not privy to the status or the substance of the grand jury's investigation.

movants [        ] full access to all relevant materials produced by the government or to let them conduct direct or cross-examination of government investigative personnel during ongoing grand jury proceedings. In our view, *Barry* did not contemplate such an adversarial evidentiary hearing as the next stage following a *prima facie* case. Indeed, we have been hard pressed to find any case in which a Rule 6(e)(2) proceeding has been conducted in such a manner; in all reported cases brought to our attention, *in camera* and/or *ex parte* proceedings have been the norm. *See, e.g., Eisenberg,* 711 F.2d at 966 (prohibiting preindictment participation by targets); *Barry v. United States,* 740 F.Supp. at 888, 894 (D.D.C.1990) (district court holds government's documentary submission sufficient to rebut *prima facie* case); *Donovan,* 552 F.Supp. at 390 (court holds *in camera* proceeding in which government responded to questions submitted to court by defense counsel and by court); *see also* PAUL S. DIAMOND, FEDERAL GRAND JURY PRACTICE AND PROCEDURE § 10.02 (3d ed.1997) ("It is rare indeed for a court to require that the government meet its burden under Rule 6 by presenting the testimony of its attorneys and agents, thus subjecting them to cross-examination. There is obvious potential for defense abuse of the government and interference with the grand jury were the courts to require live rebuttal testimony in all cases.") (footnote omitted); *cf. Barry,* 865 F.2d at 1326 (characterizing request to disclose grand jury matters as "extraordinary"). In balancing the movants' right to discovery and direct participation in questioning the IC or his prosecutors against the interest in maintaining grand jury secrecy, we must inevitably give priority to ensuring that a proceeding to enforce the protections of Rule 6(e)(2) does not ultimately subvert the rule itself.[15]

### B. *The Appropriate Procedure*

We will now endeavor to set forth the contours of how a show cause hearing may proceed once a *prima facie* case has been established, recognizing that within these boundaries, the district court should have sufficient leeway to establish procedures it believes will assist it best in discovering the truth of the matter while at the same time not causing undue interference with either the work of the grand jury or that of the district court itself.

We find the Eleventh Circuit's decision in *Eisenberg* to be the most useful precedent on the direction the show cause hearings should take. In *Eisenberg,* the targets of two grand juries filed motions in district court alleging violations of Rule 6(e)(2) and submitting as proof various newspaper articles that reported government agents and attorneys as the source of the information disclosed. The district court, after finding the articles conclusively established the existence of a Rule 6(e)(2) violation, ordered counsel for the government to identify to counsel for the targets "each government attorney, officer, agent, or employee with access to the aforedescribed grand jury matters" as well as to furnish affidavits executed by each such person that included the identity of any news media representative with which they had communicated and the circumstances and substance of each communication. *Id.* at 962 (internal quotation omitted). As in our case, the government in *Eisenberg* did not contest the district court's conclusion that the news articles submitted established a *prima facie* case or that it was required to provide the designated information to the court for its consideration. The government did challenge, however, just as the IC does here, any requirement that it furnish that information

---

15. Our decision to limit direct movant participation at this second stage of the show cause hearing is further fueled by the immediacy of the potential harm to the grand jury. As we understand it, this grand jury is still hearing testimony, and while the interest in grand jury secrecy does not disappear altogether after the investigation is concluded, *see Douglas Oil,* 441 U.S. at 222, 99 S.Ct. 1667, it is at its most intense while the investigation is ongoing. *See, e.g., In re Grand Jury Subpoena,* 72 F.3d 271, 275 (2d Cir.1995)

("The government represents that the grand jury investigation here is very much ongoing, thereby heightening the government's interest in secrecy."). Indeed, it would obviously be futile to invoke civil contempt sanctions, which are intended to be forward-looking and prophylactic, if grand jury proceedings were already concluded. This requires that extra care be taken in structuring appropriate Rule 6(e)(2) proceedings to ensure that the course of the grand jury's investigation is not diverted.

directly to the targets at a time before any indictments had yet issued. *Id.* at 963–64.

The Eleventh Circuit reversed the district court's order to produce information about the press disclosure to the targets before indictments had been issued or the grand jury's investigation had ended. Ruling that the articles established only a *prima facie* case, the Court of Appeals nonetheless found it appropriate for the district court to have ordered the government "to take steps to stop any publicity emanating from its employees" before moving to a consideration of whether the government had in fact violated Rule 6(e)(2) by past disclosures. *Id.* at 964. The court stated decisively, however, that the targets should not be allowed to participate directly in this inquiry as to the government's culpability. Rather, the district court should first have conducted an *in camera* review of the government's proffer of evidence as to its conduct:

> [W]e do not think the court properly balanced the targets' interest in the information with the harmful effects that could follow the disclosure to targets' counsel of names of all the government employees involved in the investigation.... Such information could lead counsel to call upon those government agents and attempt to interview them; news would spread that the attorneys for the targets were invading the province of the grand jury; and prospective witnesses could be intimidated from testifying.

*Id.* at 965. As a result, the *Eisenberg* court held that the information identified by the district court "should first be furnished to the district court *in camera*"; after reviewing this material, the district court could then determine whether further proceedings were necessary as well as the extent of the targets' involvement in those proceedings. *Id.* at 966.

■ Admittedly, *Eisenberg* does not provide all the answers. It is not entirely clear, for example, whether the *Eisenberg* court contemplated that the *in camera* review of

the government's rebuttal evidence might, if it failed to satisfy the judge as to the government's innocence or guilt, be followed by a hearing in which the targets' counsel would be allowed to participate in order to determine the existence of a violation, *see id.* ("The court may subsequently determine whether a hearing should be held on the alleged government violations of Rule 6(e) and whether counsel for targets should be present at the hearing."), or whether the court would make the decision on the existence of a violation by itself and invite the presence of the targets' counsel only at the remedy stage, *see id.* at 965 ("Once the court determines that Rule 6(e) has been violated, the court may properly inform the targets' counsel of the names of the violators. Targets' counsel may then play a proper role in hearings involving imposition of contempt sanctions on government employees."). To the extent *Eisenberg* can be read to suggest that counsel for Rule 6(e)(2) plaintiffs should be permitted to play an adversarial role in the show cause hearing, we cannot agree. We do find persuasive, however, the *Eisenberg* court's conclusion that *in camera* review of the government's *ex parte* proffer is the most appropriate way to conduct proceedings in Rule 6(e)(2) cases and protect grand jury secrecy.

■ The use of *in camera* review in proceedings collateral to a grand jury investigation is by no means novel. District courts are often required to conduct an *in camera* review of grand jury material requested under Rule 6(e)(3)(C)(i)[16] to determine what material, if any, is responsive to the need asserted by the requesting party; this *in camera* review "is necessary due to the paramount concern of all courts for the sanctity and secrecy of grand jury proceedings." *Lucas v. Turner*, 725 F.2d 1095, 1109 (7th Cir. 1984); *see also In re Special Grand Jury 89–2*, 143 F.3d 565, 572 (10th Cir.1998); S. REP. No. 95–354, at 8 (1977), *reprinted in* 1977

---

16. Rule 6(e)(3)(C)(i) permits disclosure of "matters occurring before the grand jury" when "so directed by a court preliminary to or in connection with a judicial proceeding." FED. R.CRIM. P. 6(e)(3)(C)(i). Parties seeking such material must show "that the material they seek is needed to

avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Douglas Oil*, 441 U.S. at 222, 99 S.Ct. 1667.

U.S.C.C.A.N. 527, 532 ("It is contemplated that the judicial hearing in connection with an application for a court order by the government under subparagraph (3)(C)(i) should be *ex parte* so as to preserve, to the maximum extent possible, grand jury secrecy."). Similarly, courts often use *in camera, ex parte* proceedings to determine the propriety of a grand jury subpoena or the existence of a crime-fraud exception to the attorney-client privilege when such proceedings are necessary to ensure the secrecy of ongoing grand jury proceedings. *See, e.g., In re Grand Jury*, 103 F.3d 1140, 1145 (3d Cir.), *cert. denied sub nom. Roe v. United States*, — U.S. —, 117 S.Ct. 2412, 138 L.Ed.2d 177 (1997) ("*Ex parte in camera* hearings have been held proper in order to preserve the ongoing interest in grand jury secrecy."); *In re Grand Jury Proceedings, Thursday Special Grand Jury September Term, 1991*, 33 F.3d 342, 353 (4th Cir.1994) ("[T]he government's proffer [as to the existence of the crime-fraud exception] was made *in camera* because it concerned matters subject to an on-going investigation before the grand jury."). Although *in camera, ex parte* submissions "generally deprive one party to a proceeding of a full opportunity to be heard on an issue," *In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir.1982), and thus should only be used where a compelling interest exists, *see, e.g., In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994), we find that the nature of a Rule 6(e)(2) hearing, particularly when conducted during an ongoing grand jury investigation, involves such a compelling interest. *See, e.g., In re Grand Jury Proceedings*, 33 F.3d at 353 (holding that "*in camera* proceedings in the context of grand jury proceedings and ongoing investigations requiring secrecy are not violative of due process" despite lack of opportunity to rebut government's proffer); *In re John Doe*, 13 F.3d at 636 ("[W]here an *in camera* submission is the only way to resolve an issue without compromising a legitimate need to preserve the secrecy of the grand jury, it is an appropriate procedure."); *In re John Doe Corp.*, 675 F.2d at 490 ("We recognize that appellants cannot make factual arguments about materials they have not seen and to that

degree they are hampered in presenting their case. The alternatives, however, are sacrificing the secrecy of the grand jury or leaving the issue unresolved at this critical juncture.").

■ In light of these concerns, we conclude that the show cause hearing in this instance should not proceed in a fully adversarial manner when only a *prima facie* case has been made. We emphasize, however, that the burden of rebutting the *prima facie* case will lie with the IC, who must now come forward with evidence, in whatever form the district court requires (including affidavits, depositions, production of documents, or live testimony) to rebut the inferences drawn from the news articles that established the *prima facie* case of a Rule 6(e) leak to the press by personnel in or "close to" the IC's office. This evidence should be submitted *ex parte* and *in camera* for the district court's review. Because the government must negate at least one of the two prongs of the *prima facie* case—by showing either that the information disclosed in the media reports did not constitute "matters occurring before the grand jury" or that the source of the information was not the government—relevant evidence might include "what actually occurred before the grand jury, whether purported grand jury disclosures are accurate, the identities of its employees with access to any of the grand jury information disclosed, and whether these individuals in turn provided any such information to the media," *Barry*, 740 F.Supp. at 890, as well as evidence as to the IC's general policies concerning press contacts, evidence as to the actual source of information reported by the press, or evidence describing any actual exchanges between a member of the IC's staff and a member of the press associated with one of the identified reports. The district court's task at this stage is to review the IC's evidentiary submissions and determine whether they are sufficient to rebut the movants' *prima facie* case—in other words, whether the evidence presented by the government is sufficient to render the identified press reports [17] inaccurate either in their

---

**17.** Although *Barry* makes reference to a determination of whether there has been a "pattern or

characterization of material as grand jury related or in their identification of the source of the information. If the district court determines that the IC's submission is insufficient to rebut the *prima facie* case, or, indeed, if the IC or a member of his staff admit to violations, no further proceedings are necessary, and the district court may proceed to find that a Rule 6(e)(2) violation has occurred and determine the appropriate remedy. The announcement of the court's finding should be available to the movants and their participation in any remedy hearing presumptively allowed. If, on the other hand, the district court determines that the IC's submission conclusively rebuts the *prima facie* case, the show cause order should be discharged.[18] In either event, this first stage should be *ex parte* and *in camera* in order to minimize the intrusion on the interests protected by Rule 6(e)(2).

■ If, however, after review of the government's rebuttal case the district court finds that it cannot make an adequate determination as to whether a violation of the rule has occurred, or if the district court cannot identify with certainty the individual or individuals responsible, further proceedings may be appropriate. Although the district court should take care to protect the secrecy of the grand jury investigation by continuing to conduct the proceedings *in camera* and *ex parte*, we do not wish unnecessarily to cabin the district court's discretion as to the type of factfinding tools it may use. The court may, for example, request further affidavits or other types of documentary evidence from either the government or the movants; it may request that a member of the IC's staff or another witness answer questions of the court or questions submitted by the movants upon the court's invitation; the court may, if it so chooses, appoint a special master or other individual to collect evidence and submit a report to the district court for its review and adjudication. *See, e.g., Eisenberg*, 711 F.2d at 966 ("We can conceive of circumstances where a district court could seek the appointment of a special counsel to assist the court in determining whether Rule 6(e) violations had occurred.").[19]

■ If at the end of the day the district court determines that a violation of Rule 6(e)(2) has occurred, it may report this finding to the movants and identify the government agent or attorney responsible for the disclosure.[20] *See Eisenberg*, 711 F.2d at 965. The movants may then participate in determining the appropriate remedy, which, as we have noted, may include equitable relief, contempt sanctions, or both, *see Barry*, 865 F.2d at 1321–22, keeping in mind that the relief granted should be "carefully tailored to avoid unnecessary interference with grand jury proceedings," *id.* at 1323. Finally, the district court must keep a transcribed record of what transpired in any *in camera* proceeding; should the grand jury ultimately issue indictments, the indicted party or parties may request the transcript of the Rule 6(e)(2) proceedings in order to determine whether to contest any indictment on the

practice of impermissible disclosures of grand jury material," *see Barry*, 865 F.2d at 1325, this should not be construed as requiring the district court to extend the Rule 6(e)(2) inquiry beyond the news articles submitted by the movants. Indeed, in order to limit the district court's function to adjudication rather than investigation, we find it entirely appropriate to limit any findings to those articles.

18. Because it is unlikely that a news report will attribute the disclosure of purported grand jury material to a specific individual, it is possible that a showing as to each individual associated with the IC who has access to certain material will be required to constitute sufficient rebuttal. *Cf. Lance*, 610 F.2d at 219 ("The inability to show a definite source for some of the information contained in the articles might cause a prima facie case to fail if a responsive affidavit denying the allegations is made."). We note that pursuant to Rule 6(e)(3)(B) of the Federal Rules of Criminal Procedure, the IC is required to provide to the district court the names of any government personnel who have been made privy to grand jury material in order to assist the IC in his investigation.

19. The movants acknowledged before the district court, and the IC stated in oral argument before this court, that the involvement of such an individual might be appropriate. *See* Prehearing Memorandum of President Clinton (March 10, 1998), at 3.

20. Ordinarily, the court should not reveal the precise substance of the disclosure to the movants, as this would tend to reveal "matters occurring before the grand jury."

basis of the violation. *See Eisenberg,* 711 F.2d at 965; FED R.CRIM. P. 6(e)(3)(C)(ii) (disclosure of grand jury matters permitted "at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury").[21]

## IV.

We are keenly aware that allegations that a government official has violated Rule 6(e)(2) are not to be taken lightly. As Justice Frankfurter noted, "[t]o have the prosecutor himself feed the press with evidence ... is to make the State itself through the prosecutor, who wields its power, a conscious participant in trial by newspaper, instead of by those methods which centuries of experience have shown to be indispensable to the fair administration of justice." *Stroble v. California,* 343 U.S. 181, 201, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (Frankfurter, J., dissenting). It is the very interests in protecting grand jury secrecy underlying the rule, however, that call for the utmost discretion on the part of the courts to ensure that the rule is not breached in the very act of rooting out violations. We believe the intent of *Barry* in characterizing the inquiry into Rule 6(e)(2) violations as civil is honored by allowing the movants to identify any violations of the rule and, if necessary, to participate in crafting a remedy designed to stop further violations. Any direct participation in deciding whether a violation has occurred and by whom should be allowed by the district court only in extraordinary circumstances and as a last resort. The procedure we have outlined is designed to "allow the court to focus on the culpable individual rather than granting a [discovery] windfall" to the movants. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988).

■ We have decided the merits of the IC's challenge to the district court orders by granting its petition for writ of mandamus. Accordingly, we dismiss the appeal in No. 98-3077 *et al.,* vacate the procedural aspects of the district court's orders of June 19 and June 26, and remand for further proceedings consistent with this opinion.

*It is so ordered.*

---

21. At this stage an adversarial presentation may be appropriate, since "[w]hat appears to be harmless to a district judge may be prejudicial if seen in light of a defense counsel's special familiarity with a given prosecution." *United States v. Fowlie,* 24 F.3d 1059, 1066 (9th Cir.1994).