UNITED STATES of America

v.

Stephen FLEMMI

No. 94–10287–MLW.

United States District Court,
D. Massachusetts.

Nov. 14, 2000.

Richard M. Egbert, Boston, MA, Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Kimberly Homan, Boston, MA, for Defendant.

Fred M. Wysjak, Jr., Brian T. Kelly, James D. Herbert, John Durham, Richard L. Hoffman, U.S. Atty's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

WOLF, District Judge.

On October 11, 2000, defendant Stephen Flemmi filed a Supplemental Submission in Support of His Motion to Dismiss and/or for Sanctions for Violations of Fed. R.Crim.P. 6(e) and Local Rule 83.2A (the "Motion"), based primarily on an October 9, 2000 *Boston Globe* article headlined "Flemmi allegedly strangled girlfriend." The government filed a memorandum in opposition to the Motion. In contrast to its practice in this and comparable cases, the government did not submit affidavits denying that it was the source of the information at issue. A hearing addressing the Motion, among other things, was held on October 31, 2000.

The Motion presents a close question of whether there is a *prima facie* case of a violation of Federal Rule of Criminal Procedure 6(e) ("Rule 6(e)") and/or Rule 83.2A of the Local Rules of the United States District Court for the District of Massachusetts ("Local Rule 83.2A"). Therefore, the government is being ordered to file, *ex parte* and under seal, affidavits from each of the government employees authorized to have access to information obtained in any grand jury investigation of the murder of Debra Davis. The affidavits will assist the court in determining whether the defendant has established a *prima facie* case of a violation of Rule 6(e) and/or Local Rule 83.2A, and whether the government should, therefore, be required to seek to show cause why the court should not conclude that misconduct has occurred and impose appropriate sanctions.[1]

The October 9, 2000 *Boston Globe* article, attached hereto as Exhibit 1, states in its most pertinent part that:

> A former associate of Flemmi and his longtime partner, South Boston gangster James "Whitey" Bulger, has told investigators that Flemmi strangled Davis inside his mother's house, according to sources familiar with the investi-

---

1. As stated at the October 31, 2000 hearing, the court is not now considering the possible dismissal of this case as a remedy for any possible improper disclosures to the media. Rather, if any government misconduct is established, the court intends to attempt to empanel an impartial jury before deciding whether Flemmi is entitled to dismissal of this case because his right to a fair trial has been irreparably injured.

If information subject to Rule 6(e) and/or Local Rule 83.2A has been improperly disclosed, any individual responsible could be held in criminal contempt and punished. *See* Fed.R.Crim.P. 6(e)(2); *Blalock v. United* States, 844 F.2d 1546, 1558 (11th Cir.1988) (Tjoflat, J., concurring). The court may also impose "civil contempt sanctions or equitable relief or both 'depending upon the nature of the violation and what the trial court deems necessary to prevent further unlawful disclosures....'" *In re Sealed Case No. 98–3077*, 151 F.3d 1059, 1068 (D.C.Cir.1998) (quoting *Barry v. United States*, 865 F.2d 1317, 1323 (D.C.Cir.1989)); *see also* Rule 83.2B of the Local Rules of the United States District Court for the District of Massachusetts; *Levine v. United States Dist. Court for the Cent. Dist. Of Calif.*, 764 F.2d 590, 596 (9th Cir. 1985).

gation. It is unclear whether Mary Flemmi, who died last May, was home at the time.

Later that night, Flemmi and Bulger allegedly carried Davis's lifeless body outside and drove to an isolated area under the train tracks in Quincy, where they buried her in a marshy grave at the edge of the Neponset River, according to sources.

On September 27, 2000, Flemmi and Bulger were charged in a Superceding Indictment in another case with murdering Davis as part of a Racketeering conspiracy. *See United States v. Kevin O'Neill, James J. Bulger, and Stephen J. Flemmi,* 99–10371–RGS (Racketeering Act 13).[2] The government has informed the court that Davis' body was subsequently found in the area referenced in the October 9, 2000 *Boston Globe* article.

■ When a violation of Rule 6(e) is alleged, the court must first decide whether the moving party has presented a *prima facie* case of such misconduct. *See, e.g., In re Sealed Case, No. 98–3077,* 151 F.3d at 1067–69; *In re Grand Jury Investigation,* 610 F.2d 202, 214–20 (5th Cir. 1980) (*"Lance"*). If so, "the burden shifts to the government to 'attempt to explain its actions' in a show cause hearing." *In re Sealed Case No. 98–3077,* 151 F.3d at 1068 (quoting *Barry,* 865 F.2d at 1325). The government agrees that the same standards and procedures should be utilized when a violation of Local Rule 83.2A

is alleged. Gov't Response to Court's October 17, 2000 Order at 1–2. Therefore, the immediate question is whether the defendant has presented a *prima facie* case of a violation of Rule 6(e) and/or Local Rule 83.2A.

■ Rule 6(e) permits matters occurring before a grand jury to be disclosed to an attorney for the government and any government personnel necessary to assist him or her to enforce federal criminal law. *See* Fed.R.Crim.P. 6(e)(2) and 6(e)(3)(A)(ii). Rule 6(e)(2) prohibits those individuals from disclosing "matters occurring before the grand jury" except as authorized by the Rule. "[M]atters occurring before the grand jury" include testimony presented to the grand jury and information obtained by a government official who, in pursuing an investigation that is not truly independent of the grand jury's inquiry, has become an agent of the grand jury. *See In re Grand Jury Subpoena,* 920 F.2d 235, 241–43 (4th Cir.1990); *In re Grand Jury Subpoena; John Doe No. 4,* 103 F.3d 234, 238–39 (2d Cir.1996).

The United States District Court for the District of Massachusetts has promulgated Local Rule 83.2A, captioned "Release of Information by Attorneys," to supplement Rule 6(e). Local Rule 83.2A prohibits an attorney from making certain extrajudicial statements which go beyond the public record and that he or she should expect will be publicly reported. *See* Local Rule 83.2A. Such prohibited statements include comments about, among other things, a grand jury or other pending investigation[3]

2. As described in the October 17, 2000 Order, at 2 n. 1, the judges to whom the three active cases against Flemmi have been assigned have agreed that it is permissible and most appropriate that his motion alleging that violations by the government of the rules and regulations intended to protect his right to a fair trial be addressed, at least initially, in the context of the instant case, which is the oldest and will be first to be tried.

3. Local Rule 83.2A includes several exceptions to the prohibition against making public statements concerning grand jury and other investigations which are not relevant to the instant matter. More specifically, a prosecutor may make statements "necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of dangers, or otherwise to aid in the investigation." *See* Local Rule 83.2A.

and, after an indictment, about the criminal record or character of the accused. *Id.* Local Rule 83.2A represents part of this District Court's response to the Supreme Court's direction that:

> The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function.

*Sheppard v. Maxwell,* 384 U.S. 333, 363, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *see also Levine,* 764 F.2d at 596.

As juries are regularly instructed, an indictment returned by a grand jury is merely an accusation intended to put a defendant and the public on notice of the charges against him, and to require that he be tried. An indictment is not permitted to be considered at trial as evidence of guilt. A grand jury is allowed to receive information that is not admissible at trial under the Federal Rules of Evidence. *See* Fed.R.Evid. 1101(d)(2). It is fundamental to our system of justice that a defendant has a right to a fair trial, untainted by prejudicial information that is not presented to the jury in court. As Justice Oliver Wendell Holmes explained, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *See Patterson v. Colorado ex. rel. Attorney General,* 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907). Therefore, it is important that information presented to a grand jury, or developed in another investigation, that may prove to be inadmissible at trial not be brought to the attention of potential jurors in violation of Rule 6(e) or Local Rule 83.2A.

At the same time, it should be recognized that government personnel subject to the secrecy requirements of Rule 6(e) and Local Rule 83.2A are not the only individuals with access to information concerning what occurred before a grand jury or in other investigations. Witnesses are free to discuss their grand jury testimony and statements to investigators. *See* Fed. R.Crim.P. 6(e). Subjects of investigation or their counsel may obtain information about an investigation from witnesses who have been interviewed or testified before the grand jury, or their counsel. Grand jury witnesses, or those who obtain information from them, are not prohibited from speaking to the media. Thus, public reports of matters that may have occurred before the grand jury or about other investigations do not necessarily indicate that the government has violated its duties under Rule 6(e) or Local Rule 83.2A.

Because it is important both that the courts enforce the requirement that government personnel not disclose matters occurring before the grand jury or in related investigations, but not presume that government misconduct has occurred every time a possible violation of Rule 6(e)(2) or Local Rule 83.2A is alleged, courts require that a *prima facie* case of a violation be presented before requiring that the government seek to show cause why it should not be found to have made a prohibited disclosure and be sanctioned. *See, e.g., In re Sealed Case No. 98–3077,* 151 F.3d at 1067–68; *Barry,* 865 F.2d at 1321; *Lance,* 610 F.2d at 214–20; *United States v. Eisenberg,* 711 F.2d 959, 963–64 (11th Cir. 1983).

■ "In determining whether a party alleging a violation of Rule 6(e) based on news media reports has established a *prima facie* case, a court must consider several factors. First, there must be a clear indication that the media reports disclose

information about 'matters occurring before the grand jury.' ... Second, the article or articles must indicate the source of the information revealed to be one of those proscribed by Rule 6(e)...." *Lance,* 610 F.2d at 216–17; *see also In re Sealed Case No. 98–3077,* 151 F.3d at 1067 (quoting *Barry,* 865 F.2d at 1321). As the Court of Appeals for the District of Columbia Circuit wrote in connection with an issue arising from the Independent Counsel's investigation of President Bill Clinton, with regard to establishing a *prima facie* case:

> [T]he plaintiff's burden in a Rule 6(e)(2) proceeding is relatively light. The articles submitted need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government; in fact "[i]t is not necessary for [an] article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection." *Barry,* 865 F.2d at 1325 (internal quotation omitted).

*In re Sealed Case No. 98–3077,* 151 F.3d at 1068 n. 7.

██ However, "[t]he inability to show a definite source for some of the information contained in the articles might cause a *prima facie* case to fail if a responsive affidavit denying the allegations is made." *Lance,* 610 F.2d at 219. Indeed, when, as here, a meaningful question of possible misconduct is presented by the media report in question and the government does not concede that a *prima facie* case exists, the government almost always files such affidavits. *Id.* at 219–20 ("In all of the cases discussed above, the government official responsible for the investigation denied by affidavit that any person associated with the government had disclosed information in violation of Rule 6(e)."). As indicated earlier, when Flemmi first filed his motion alleging violations of Rule 6(e), Local Rule 83.2A, and this court's Protective Orders, the government followed this practice and promptly filed affidavits from the United States Attorney and nine other prosecutors denying that they had violated Rule 6(e) or the Protective Orders. *See* Feb. 24, 2000 Memorandum and Order at 2–3.

As also described earlier, however, no affidavits have been filed by the government in response to Flemmi's motion concerning the October 9, 2000 *Boston Globe* article. In the circumstances described below, the court cannot on the present record find that a *prima facie* showing of a violation of Rule 6(e) and/or Local Rule 83.2A has not been made. *See Lance,* 610 F.2d at 220. The court is, however, giving the government an opportunity to attempt to avert a show cause hearing by ordering it to file the affidavits that it typically furnishes voluntarily.

In evaluating the October 9, 2000 *Boston Globe* article, the court must assume that the statements in the article are true. *Id.* at 219; *In re Sealed Case No. 98–3077,* 151 F.3d at 1067. The article reports on what a former associate of Flemmi's purportedly told investigators about Davis' death. Flemmi has now been charged, in another case, with her murder as a racketeering act constituting part of an alleged RICO conspiracy. It is, therefore, evident that some information concerning Davis' death was presented at least to the grand jury that returned that indictment. The attorneys working with the grand jury may have acquired additional information concerning her demise that would be subject to Local Rule 83.2A, if not Rule 6(e). The indictment, however, does not disclose how or where Davis was murdered, or where she was buried. Therefore, the article is susceptible to the interpretation that it reports on evidence that is not part of the public record, but which was presented to the grand jury or was provided to investi-

gators acting as the grand jury's agents. Depending on its source, however, this may be information which will prove to be inadmissible at Flemmi's trial on the racketeering charges relating to the Davis murder. It is in any event information prejudicial to Flemmi that is almost certain to be found to be irrelevant and inadmissible at the trial of the instant case. Thus, in the absence of government affidavits, the first prong of the *prima facie* test appears to have been met and the purposes to be served by Rule 6(e) and Local Rule 83.2A seem to have been undermined. *See Lance*, 610 F.2d at 217–18; *In re Sealed Case No. 98–3077*, 151 F.3d at 1067.

■ Whether the article indicates that the information at issue came from a prohibited source presents a closer question. The article ascribes the information it reports concerning Davis' death to "sources familiar with the investigation." This could be a reference to witnesses or others not bound to secrecy by Rule 6(e) or Local Rule 83.2A. However, this fact is insufficient to end the inquiry.

Members of the media have a right to ask government employees about matters that those individuals are prohibited from discussing or disclosing. The media's effort to obtain such information would almost always fail if an individual violating a legal prohibition against disclosure believed his or her identity would be revealed.

This court stated previously in this case that if reporters wrote that they were describing testimony presented to a grand jury as revealed to them by government personnel, "the authors would have unambiguously revealed that a violation of Rule 6(e) had occurred and, in the process, discouraged past and potential sources from providing additional information." Feb. 24, 2000 Memorandum and Order at 17. Thus, this court then inferred that reporters may write their articles in a manner

intended to mask misconduct by their sources. *Id.*

This insight was subsequently confirmed in this case. A February 27, 2000 *Boston Sunday Globe* article reported that the newspaper had obtained a transcript of a debriefing of John McIntyre that was subject to a Protective Order prohibiting its dissemination to members of the media, among others. The article referred to three law enforcement officers who participated in the debriefing of McIntyre, Richard Bergeron, David Boeri, and Roderick Kennedy. The article stated that: "Last week, Boeri did not return telephone calls. Bergeron and Kennedy declined to comment." Nevertheless, the court ordered Bergeron, Boeri, and Kennedy to appear for a hearing concerning the apparent violation of the Protective Order. Bergeron promptly revealed that he spoke twice to the author of the article about the transcript, met with the author and gave him a copy of the transcript, and did not ask the author not to use his name, although he assumed he would not be identified as the source of the transcript. *See* Mar. 3, 2000 Tr. at 122, 126–28, 130–32, 145–46, 153–55, 171–72. When the author later called Bergeron to ask if he had any comment concerning the transcript, Bergeron said: "It speaks for itself." *Id.* at 158, 170.

In the circumstances, the fact that the October 9, 2000 *Boston Globe* article only cites "sources familiar with the investigation," rather than government personnel, cannot properly end the inquiry concerning whether the second prong of the *prima facie* test is met. Rather, the articles on their face present a substantial question of whether the required *prima facie* showing of a violation of Rule 6(e) and/or Local Rule 83.2A has been made and the court has not been provided with the affidavits that are typically filed voluntarily by the government in comparable cases. *See Lance*, 610 F.2d at 219.

Accordingly, it is hereby ORDERED that, by December 6, 2000:

1. The United States Attorney shall submit an affidavit stating whether any grand jury that received evidence concerning Davis' death, or any attorney or investigator working in connection with such grand jury, was told that: (a) Flemmi strangled Davis; (b) she was murdered at his mother's house; and/or (c) she was buried near the edge of the Neponset River. With regard to these questions, the United States Attorney may rely on the submission made *ex parte* and under seal on November 2, 2000, if he confirms that it is accurate and complete.

2. Each of the individuals listed on Exhibit 2 hereto (under seal), who the court has been informed constitute the government personnel authorized to have access to matters occurring before any grand jury which heard evidence concerning the death of Davis, shall file an affidavit stating:[4]

a) Whether he or she has ever communicated with anyone who works for the *Boston Globe*, including but not limited to Shelley Murphy, concerning Davis and, if so, describing what was said or otherwise communicated on each such occasion.

b) Whether he or she has communicated with anyone not listed on Exhibit 2 hereto (under seal) concerning Davis and, if so, what was said or otherwise communicated on each such occasion. This response shall include, but not be limited to, whether he or she has communicated any information obtained in any investigation of Davis' death to any member of Davis' family.

3. As agreed by Flemmi at the October 31, 2000 hearing, the foregoing affidavits shall be filed *ex parte* and under seal for the court's *in camera* consideration at least until the court determines whether a *prima facie* showing of a violation of Rule 6(e) and/or Local Rule 83.2A has been made.

4. If the government wishes to assert that any individual listed on Exhibit 2 (under seal) should not be required to submit an affidavit, it shall, by November 20, 2000, file a motion for a modification of this Order, stating with specificity why that individual should be exempted.

Exhibit 1

+ City/Region News B1-8
Lottery B2
Starts & Stops B2
New England News Briefs B3

Globe
10-9-2000

# Flemmi allegedly strangled girlfriend

## His mother's home said to be the scene

By Shelley Murphy
GLOBE STAFF

As reputed gangster Stephen Flemmi drove his car through South Boston on a crisp September night in 1981, his girlfriend, Debra Davis, sat pressed against the passenger side door, trying to put as much distance as possible between herself and the man she no longer loved.

Davis, a stunning 26-year-old blonde, had fallen in love with a young Mexican businessman she had met while vacationing in Acapulco and wanted to end her nine-year romance with Flemmi. But he apparently had other plans.

The car came to a halt outside Flemmi's mother's house on East Third Street, and the unhappy couple walked inside. It was allegedly the last place Davis was seen alive.

A former associate of Flemmi and his longtime partner, South Boston gangster James "Whitey" Bulger, has told investigators that Flemmi strangled Davis inside his mother's house, according to sources familiar with the investigation. It is unclear whether Mary Flemmi, who died last May, was home at the time.

Later that night, Flemmi and Bulger allegedly carried Davis's lifeless body outside and drove to an isolated area, under the train tracks in Quincy, where they buried her in a marshy grave at the edge of the Neponset River, according to sources.

After two weeks of digging along the banks of the river last month in an area located just 100 yards from a condominium where Bulger used to live, investigators located the remains of a man who allegedly was murdered by Bulger and Flemmi in 1976. But they were unable to locate the remains of Davis and have suspended digging.

Still, federal prosecutors have pushed forward with a sweeping federal racketeering indictment, unsealed Sept. 28, that charges Bulger with 18 murders and Flemmi with 10 murders between 1973 and 1985. Both men are charged with slaying Davis. Bulger, 71, has been a fugitive since he was in-

DAVIS, Page B4

DEBRA DAVIS
Body has not been found

# Flemmi allegedly killed woman in mother's home

> DAVIS

*Continued from 21*

stand in January 1995 on federal racketeering charges, and Flemmi, 65, has remained in jail for dead five years while awaiting trial in the another case.

"It's not a consolation to us that they have been charged with her murder if they don't find the body," said Victor Davis, who, along with several of his brothers, stood vigil near the Quincy site last month during the search for his sister's remains.

"We've always known Stevie killed her. Our ultimate goal is to bury her. If we don't get to bury her this right way, it's going to gnaw at us for the rest of our lives. We want to know where she is."

Victor Davis was reluctant yesterday to discuss the case, invoking the adage, noting that the family has hired a lawyer and is considering a lawsuit against the FBI. Bulger said Flemmi were spending as informants when Davis disappeared. In the years following her disappearance, FBI agents maneuvered her murder at length on several occasions — yet her fate remained a mystery and Flemmi and Bulger remained on the informants through 1998.

Flemmi and Bulger occasionally hosted dinners for FBI agents at the South Boston home of Flemmi's mother — the same place where Debra Davis allegedly drew her last breath.

Bulger's brother, former state Senate president William Bulger, now president of the University of Massachusetts, lives rent-free.

During federal court hearings in 1998, a retired FBI superior testified that he was having dinner with Flemmi, Bulger, and another agent at Flemmi's mother's home

when William Bulger dropped in to give some photographs to his brother.

The Davis family is watching questions about Debra Davis's case to their lawyer, but a glimpse of her life with Flemmi and her desperate effort to have him free better life emerges through earlier interviews with Victor Davis and his brothers and a number of sources familiar with the investigation into her disappearance and presumed murder.

Born on March 27, 1955, Davis was one of 10 children of Olga and Edward Davis, who began raising their family in Roxbury and later moved to Roslindale. Edward Davis ran a pawnshop on Harrison

Street in Brookline, and his daughter Debra began working nearby as a jewelry store owned by Brookline jeweler George Taylor.

Davis was 17 years her senior, started into the shop to buy jewelry for another woman and immediately became smitten with Davis.

Giving up to his aspirations with a womanizer with an eye for very young women, Flemmi lavished Davis with expensive gifts. Soon they were living together in a luxury apartment on Longwood Avenue in Brookline. Two years later, they moved into an apartment in Randolph. Davis's father, who strongly

disapproved of the relationship and didn't like Flemmi, drowned in 1975 after killing wife a boat in Boston Harbor.

The relationship continued and so old wife gifts from Flemmi to Davis: a Jaguar, a Corvette, a Mercedes. But she grew bored with unhappy in the relationship.

"Debbie wanted to get married, have a baby, and live a normal life," Victor Davis said during earlier interviews. "She didn't want him."

While vacationing in Acapulco with her mother, Davis met a wealthy young entrepreneur who was in the poultry and olive oil business. The romance flourished and Davis returned to Acapulco a few times for longer and longer vacations, staying there for about a month in the summer of 1981.

She loved him. She was going to marry him," Victor Davis said. "She was preparing to leave Stevie, but she was afraid."

She had reason to be afraid, the frequent, cold-blooded way he walked around Flemmi's suspicious, and while she was off, she chose later in the summer of 1981, Flemmi killed her murkerish rage, insists something shocking on her, wrapped around or Flemmi's mother's face, and choking on him, according to Victor Davis.

On Sept. 17, 1981, Debra Davis dropped her clothes off after a shopping trip, kissed her mother, and drove off to meet Flemmi with a promise to call the next day, the call never came.

Flemmi repeatedly demanded that Davis remain with him, but

she was a teenager. Flemmi and Bulger are accused of killing thousands in early 1985.

Within 48 hours of Davis's disappearance, her mother reported her missing to Randolph police. FBI agents later interviewed Olga Davis at length about her daughter's disappearance, but never contacted Flemmi about the cop, according to sources familiar with the probe.

In January, Bulger's trip deputy, Kevin Weeks, led investigators to the grassy site from Stevie Hall, where they unearthed the remains of Hussey and two Quincy men. Arthur "Bucky" Barrett and John McIntyre, who allegedly were killed by Bulger and Flemmi in 1983 and 1984.

The Davis family has long suspected Flemmi of killing Debra Davis, and prosecutors took the case to a major break in the case when longtime Bulger associates began cooperating with authorities in the partnership.

Last month, investigators recovered the remains of a man believed to be Paul McGonagle from a grave at the edge of Tenean Beach in Dorchester, McGonagle, a Bulger rival, but disappeared in 1974. They also recovered the remains of a man believed to be Thomas King, who disappeared in 1975, from a burial site at the edge of the expressway in Quincy.

Investigators from the Massachusetts State Police, the federal Drug Enforcement Administration, and the Internal Revenue Service, who have operated the Bulger-Flemmi probe, were unable to learn Davis's remains, despite information that she was buried at the Quincy site.

Investigators have said they are not giving up on finding Davis.

Debra Davis is believed to be buried in an unmarked grave at the edge of the Neponset River under the train tracks in Quincy.

he was never faithful to her.

At the same time that Flemmi started an apartment with Davis, he was dating with Marion Hussey, a woman he had been with once separating from his wife in the late 1960s. Flemmi and Hussey had three children together, and one he is accused of killing Hussey's daughter from another marriage.

In January, the remains of Deborah Hussey, who was just three years younger than Debra Davis, were unearthed from a malachite green course from Hyster Hall in Dorchester. Flemmi had allegedly been hiding on at his wife with Deborah Hussey since

EXHIBIT 2

UNDER SEAL

REDACTED